[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 00-16686

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 25, 2002
THOMAS K. KAHN
CLERK

D. C. Docket No. 00-14019-CR-KMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CARLOS ENRIQUE RAMIREZ-CHILEL,
a.k.a. Carlos-Enrique Ramirez-Chelel,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(April 25, 2002)**

Before BIRCH and WILSON, Circuit Judges, and DOWD[*], District Judge.

WILSON, Circuit Judge:

Carlos Enrique Ramirez-Chilel was convicted of knowing possession with

_____

[*] Honorable David D. Dowd, Jr., U.S. District Judge for the Northern District of Ohio, sitting by designation.

the intent to use and transfer unlawfully five or more false United States identification documents in violation of 18 U.S.C. § 1028(a)(1) and (a)(3) and of knowing and unauthorized possession of blank immigration permits in violation of 18 U.S.C. § 1546(a). Ramirez-Chilel now appeals the district court's decision to deny his motion to suppress all physical evidence seized from his bedroom on the night of March 15, 2000, as well as his post-arrest confession made later that night at the police station. Specifically, he argues that (1) the court made clearly erroneous credibility determinations as to who answered the door of the residence when the officers knocked; (2) the officers' initial entry into his residence was illegal; and (3) the subsequent search of his home and resulting post-arrest statement were both products of the unlawful entry and should have been excluded. We find that the district court's findings of fact were not clearly erroneous and that the law enforcement officers' entry into Ramirez-Chilel's home and subsequent search was legal. We therefore affirm.

## BACKGROUND

At approximately 11:45 p.m. on March 15, 2000, Detectives Zealor and Hyde, both officers on the Treasure Coast Drug Enforcement Agency (DEA) Task Force, Immigration and Naturalization Service (INS) Investigator Guillan, and INS Agent Price proceeded to Ramirez-Chilel's trailer in Indian River County, Florida.

The officers had received a tip that someone in that trailer was producing and selling counterfeit immigration and identification documents.[1] The officers had no probable cause to search the trailer and no search warrant, nor were there any exigent circumstances for approaching the residence at that hour. The officers were hoping they would be given consent to enter and search the premises when they arrived.

Guillan, Hyde, Price, and Zealor approached the residence shortly before midnight; the officers claim to have no particular reason for arriving at night other than wanting to follow up on a tip they had recently received. Guillan knocked on the door. What happened next is a subject of much dispute.

Both Hyde and Guillan testified at the suppression hearing that they approached Ramirez-Chilel's home without weapons drawn; Guillan knocked on the front door several times and announced in Spanish that they were police officers; the defendant, Ramirez-Chilel, answered the door; Guillan spoke to Ramirez-Chilel in Spanish to request admittance "in order to determine whether or not there was any evidence of counterfeit documents or counterfeit immigration

---

[1] There is some mention in the trial transcripts of a Sergeant Brooks and a Detective Dean of the St. Lucie County Sheriff's Office who may have assisted the four law enforcement officers in locating the defendant's residence. It is unclear from the record, however, whether either officer actually entered Ramirez-Chilel's residence that night.

documents at that residence";[2] Ramirez-Chilel then "yield[ed] the right-of-way" to the officers and thus consented to their entry into the home; and, after signing a consent to search form, Ramirez-Chilel voluntarily consented to the search of the home.[3]

In their testimonies, Ramirez-Chilel and his girlfriend, Evinelli Pineda, described the events in a wholly different manner. They testified that the officers knocked loudly and announced themselves; Pineda's four-year-old son opened the door to the home; and the officers then stepped into the home and were already inside when Ramirez-Chilel emerged from his bedroom. Ramirez-Chilel testified at the hearing that Guillan spoke to him in Spanish and that he did not understand what Guillan was saying to him because Guillan was speaking both English and Spanish. Ramirez-Chilel did admit that Guillan asked if there were any guns or

---

[2] Guillan was the only officer who spoke and understood Spanish; Guillan testified that he explained to Ramirez-Chilel that they were at his home in response to an allegation of identification counterfeiting.

[3] After entering the house, Guillan again explained why they were there and that they were seeking his voluntary consent to search the premises. Guillan asked the defendant if there were any false documents or other contraband in the residence including drugs or guns, and Ramirez-Chilel responded that there was not any of those "bad things" in the residence. Guillan then took out an INS consent to search form and spent more than thirty minutes translating and going over the consent to search form in Spanish, putting a check mark after he covered each paragraph, including the paragraphs instructing the defendant that he could refuse to consent to the search. Hyde and Guillan testified that the search did not begin until after Ramirez-Chilel signed the consent to search form. Guillan also testified that all of the persons in the trailer, the defendant, his girlfriend, and the two small children, were free to leave, move about, and were not restrained in any fashion.

"bad things" in the residence and that he said no and told the officers they could go ahead and search because he knew he did not have any guns or "bad things" in the residence. Ramirez-Chilel claims that he signed some papers (i.e., the consent to search form) because Guillan said they had a right to search the trailer and he did not think that he had any choice.

When the officers searched the residence, they found counterfeit resident alien cards, counterfeit social security cards, photo residue in a garbage can, a plastic laminator, blank and completed birth certificates from Mexico, drivers' license and identification cards from the State of Kansas, and other items normally used in the production of counterfeit documents. After these items were found, Ramirez-Chilel was arrested, and Guillan then advised him of his *Miranda* rights[4] in Spanish. According to Guillan, Ramirez-Chilel acknowledged that he understood his rights and told Guillan that the documents did not belong to him, but belonged to someone named Jorge Martinez. Ramirez-Chilel denies hearing his *Miranda* rights and denies ever telling Guillan that he prepared or sold false immigration or identification documents. He claims that he said that everything belonged to Martinez, and that Martinez was allowed to live at the trailer in 1999 when he went back to Guatemala for a period of time.

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Ramirez-Chilel was then transported to the local DEA Drug Task Force Office in the St. Lucie County police station. He was read his *Miranda* rights again and signed the form. The form was in English and Guillan translated it into Spanish for Ramirez-Chilel. Thus, Guillan contends that Ramirez-Chilel voluntarily waived his *Miranda* rights and made a post-arrest statement. In the written statement, Ramirez-Chilel stated: "I bought the typewriter and the laminator from Office Depot in February, 1999. Jorge Martinez left me the counterfeits, for $800, because I thought it was good work for me." Ramirez-Chilel contends that after being arrested and taken to the sheriff's office, Guillan threatened to deport, kill, or send him to an island if he did not sign the confession, so he signed it.[5]

During the suppression hearing, the magistrate judge, faced with a fundamental credibility question, reviewed the testimony of each witness and made the following factual findings: (1) Ramirez-Chilel answered the door and consented to the officers' entry into his home; (2) Ramirez-Chilel voluntarily consented to the search of his home; and (3) Ramirez-Chilel voluntarily waived his

---

[5] Ramirez-Chilel's testimony at the suppression hearing differs from his testimony at trial. At trial, Ramirez-Chilel claimed that Guillan threatened him into signing the consent to search form and that the officers drew their weapons inside his home. We may consider this evidence because we may consider any evidence and are "not limited to the evidence introduced [at] the hearing on the motion." *United States v. Villabona-Garnica*, 63 F.3d 1051, 1056 (11th Cir. 1995).

*Miranda* rights and gave an admissible written statement.

The magistrate judge noted that the "motion boils down to essentially an issue of credibility." The magistrate judge focused on whether or not any threats of deportation and death were made – Pineda did not testify to hearing any threats and Guillan denied that threats were made. The magistrate judge also noted that both Pineda and Ramirez-Chilel were personally interested in suppressing the evidence, and that the officers did not have any vested interest in the case. Hyde did not work for the INS or any INS task force and was involved only to assist in locating the residence. Thus, the magistrate judge found the corroborating, consistent testimony of the officers more credible than that of the defendant and Pineda.

Next, the magistrate judge found Ramirez-Chilel's act of allowing the officers to enter by opening the door and stepping aside to be "properly interpreted by the law enforcement officers as consent to enter the trailer." After finding consent to enter the house, the magistrate judge then found voluntary consent to search because Guillan "meticulously read and re-read" the consent to search form, and Ramirez-Chilel signed it and later admitted to consenting to the search. The magistrate judge, rejecting Ramirez-Chilel's claims that threats were made, also found Ramirez-Chilel's written statement at the sheriff's office to be admissible

7

because his *Miranda* rights were "meticulously read and re-read to the Defendant along with the questions and his responses" contained in the statement.

In light of these credibility determinations, the magistrate judge found no basis for suppressing either the physical evidence or the written statement. The district court, after specifically noting the magistrate judge's credibility determinations, adopted the report and recommendation. After a trial, the jury found Ramirez-Chilel guilty on both counts, and the district court sentenced him to forty-one months of imprisonment for each count to be served concurrently.

## STANDARD OF REVIEW

A district court's ruling on a motion to suppress presents mixed questions of law and fact. *United States v. Santa*, 236 F.3d 662, 668 (11th Cir. 2000). "We are required to accept the district court's factual findings as true" unless they are clearly erroneous, but the district court's application of the law to the facts is reviewed de novo. *Id.*

## DISCUSSION

### I.

Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses. *Viehman v.*

8

*Schweiker*, 679 F.2d 223, 227–28 (11th Cir. 1982). In fact, in a case such as this one, where the officers' testimonies are in direct conflict with Ramirez-Chilel's and Pineda's testimonies, various courts have held that a "trial judge's . . . choice of whom to believe is conclusive on the appellate court unless the judge credits *exceedingly* improbable testimony." *United States v. Cardona-Rivera*, 904 F.2d 1149, 1152 (7th Cir. 1990); *see also United States v. Cooke*, 915 F.2d 250, 252 (6th Cir. 1990) ("An effort must be made to demonstrate why the trial court's conclusion is clearly erroneous. On appeal all we have is the cold record, and we accord considerable deference to the credibility findings of the trial court."). "In other words, [w]e must accept the evidence unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it." *United States v. Eddy*, 8 F.3d 577, 580 (7th Cir. 1993).

Therefore, in evaluating the factual version of events between the law enforcement officers and Ramirez-Chilel, we should defer to the magistrate judge's determinations unless his understanding of the facts appears to be "unbelievable." *See United States v. Rivera*, 775 F.2d 1559, 1561 (11th Cir. 1985) (holding that a jury's decision as to the credibility of a witness would not be disturbed on appeal unless the witness's testimony was unbelievable on its face). In this case, it is reasonable to assume that Guillan and Hyde's version of the facts is true – that

9

Ramirez-Chilel answered the door and voluntarily consented to the search.

Ramirez-Chilel argues that the district court's credibility determination is based upon an improper "credit law enforcement in case of conflict" rule and relies upon *Gallego v. United States*, 174 F.3d 1196 (11th Cir. 1999), to support his contention. In *Gallego*, an incarcerated defendant filed a motion to vacate his conviction under 28 U.S.C. § 2255, arguing ineffective assistance of counsel. *Id*. at 1197. An evidentiary hearing was held to determine whether Gallego was informed by his attorney of his right to testify at trial. *Id*. The district court found that Gallego was not credible and held that "as a matter of law [a] defendant could not carry his burden without presenting some evidence in addition to his own word, which is contrary to counsel's." *Id*. at 1198. On appeal, we rejected the district court's ruling that an interested attorney (accused of providing ineffective assistance) is automatically considered to be more credible than an interested defendant (seeking vacation of his sentence). *Id*. Instead, we require district courts to conduct a proper credibility determination, which includes looking to "the internal consistency of the [witness's] testimony, or his candor or demeanor on the stand." *Id*.

Ramirez-Chilel argues that the magistrate judge did not conduct a proper credibility determination, as laid out in *Gallego*, but rather credited the law

10

enforcement officers with the truth simply because they were government agents. However, after reading the magistrate judge's report and recommendation, it appears as if the magistrate judge did not base his credibility determination solely on the "status" of the witnesses, but rather weighed the testimonies of all the witnesses, taking into account the interests of the witnesses, the consistencies or inconsistencies in their testimonies, and their demeanor on the stand. The report explains why the magistrate judge chose to believe the officers over the defendant; there is nothing in the report that would indicate that the magistrate judge summarily dismissed Ramirez-Chilel's or his girlfriend's testimony strictly because he was the defendant and Hyde and Guillan were law enforcement officers.[6] Therefore, we do not find the officers' testimonies to be improbable and

---

[6] Ramirez-Chilel points to statements the magistrate judge made in his report and recommendation, such as "Why would Detective Hyde commit perjury and state that the Defendant opened the door if, in fact, the Defendant did not?" and "The Defendant has an obvious interest in the outcome of this case which would be readily apparent, i.e., a conviction may result in a lengthy prison sentence," to suggest that the magistrate judge is inherently biased in favor of law enforcement officers and against criminal defendants. These statements, when taken out of context, appear to support the defense's contention that the magistrate judge made his credibility determinations based upon the witnesses' status rather than upon the testimony itself, which may raise questions of bias and prejudice. *See United States v. Ramos*, 933 F.2d 968, 973 (11th Cir. 1991) (per curiam). However, in order to amount to reversible error, a judge's remarks must demonstrate such pervasive bias and unfairness that they prejudice one of the parties in the case. *Id.* We do not have that here. In fact, the record indicates that the magistrate judge's "statements were intended as a credibility finding." The court's credibility ruling, though adverse to Ramirez-Chilel, does not indicate pervasive bias. *Id.* at 973 & n.2. (finding that although the district judge's choice of words was poor, the comments the judge made suggesting that he would believe government agents over "a couple of drug dealers" did not indicate pervasive bias and fundamental unfairness); *see United States v. Mirkin*, 649 F.2d 78, 82 (1st Cir. 1981) ("Making credibility assessments is daily grist for a trial judge. In any

find the court's credibility determinations to be entitled to deference.

## II.

In the alternative, Ramirez-Chilel argues that if we agree with the lower court's findings of fact, that Ramirez-Chilel himself answered the door, the officers' entry was still illegal, and thus, the subsequent search of his home was tainted by this illegal entry.[7] Therefore, we must determine whether Ramirez-Chilel's act of "yielding the right-of-way" constitutes permission for the officers to enter.

A warrantless entry into a suspect's home to search the premises is presumed to be unreasonable. *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991) (citing *Payton v. New York*, 445 U.S. 573, 586 (1980)). A suspect does not consent

---

case or proceeding in which the defendant testifies, the judge, almost as a reflex process, will form an opinion about the defendant's credibility. Such determination should not, of course, be based on bias or prejudice, but prejudice does not inevitably arise as a result of forming a credibility opinion.").

[7] The government argues that Ramirez-Chilel failed to preserve this illegal entry issue for purposes of appeal because the defendant has consistently argued that the four-year-old boy opened the door and has never, until now, alternatively argued that if Ramirez-Chilel opened the door, the officers' entry would still be illegal. However, the record demonstrates that during pretrial proceedings before the district court on July 31, 2000, Ramirez-Chilel's attorney objected to the adopted report and recommendation issued by the magistrate judge, and thereby preserved the objection for appellate purposes. It is important to note, though, that because the defendant never testified that he opened the door to the officers, we must base our decision today solely upon the officers' testimonies as to what happened at the defendant's door that night. For example, we have no knowledge as to whether Ramirez-Chilel might have felt intimidated at the door when the officers arrived or whether he feels he "yield[ed] the right-of-way" or the agents "forced" their way in.

12

to a search of his residence when his consent to the entry into his residence is prompted by a show of official authority.  *Cf. United States v. Edmondson*, 791 F.2d 1512, 1515 (11th Cir. 1986).

In order for us to find that the officers' entry into Ramirez-Chilel's home was illegal, the facts must demonstrate that the defendant's consent to the officers' entry into his residence was "prompted by a show of official authority," which overcame his consent to search the premises.  *Id.*  In *Edmondson*, Federal Bureau of Investigation (FBI) agents investigating a bank robbery surrounded Edmondson's apartment, drew their weapons, and knocked on the door yelling, "FBI.  Open the door."  *Id.* at 1514.  "Edmondson opened the door, stepped back, and placed his hands upon his head."  *Id.*  We found that Edmondson's actions did not amount to consent for agents to enter, rather, the defendant's actions evidenced "an acquiescence to a show of official authority."  *Id.* at 1515.  Although it is not certain whether Edmondson actually saw the officers' drawn weapons, the defendant was definitely aware of the fact that a number of  FBI agents were at his door and at the bottom of the stairs.  *Id.*  We found that the presence of a number of officers tended to "suggest an undertaking which is not entirely dependent on the consent and cooperation of the suspect."  *Id.*

Here, the facts are distinguishable from *Edmondson*.  In this case, it is hard

13

to find a "show of force" by the officers – guns were not drawn, nor were a large number of officers surrounding the trailer ready to arrest the suspect. According to the officers, Ramirez-Chilel did not open the door, step back, and place his hands behind his back, which would have suggested intimidation and a show of force on the part of the officers. The defendant "yield[ed] the right-of-way" – this alone does not suggest that he was overwhelmed by a show of official authority.[8]

Ramirez-Chilel also points to *United States v. Gonzalez*, 71 F.3d 819, 830 (11th Cir. 1996) (quoting *United States v. Shaibu*, 920 F.2d 1423, 1426 (9th Cir. 1990)), in which we agreed with the Ninth Circuit that "it is inappropriate to 'sanction[ ] entry into the home based upon inferred consent.'" In *Gonzalez*, the

---

[8] We have some concern about the officers' decision in this instance to approach the defendant's home and seek his consent at midnight. The magistrate judge also expressed his concerns in his report and recommendation about why it was necessary for this search to occur at 11:45 p.m. Nighttime searches are deemed to be more intrusive than daytime searches, and the assemblage of law enforcement officers at one's door in the middle of the night has a tendency to be more coercive than during the day. *See United States v. Jerez*, 108 F.3d 684, 690–92 (7th Cir. 1997) (Where the officers roused the defendants from their beds in a motel in the middle of the night by knocking on the door for three minutes, shined a flashlight through the window, and requested that they open the door, the defendants were "seized" as a reasonable person in their situation would not have felt free to ignore the deputies and continue about their business.); *Fontenot v. Cormier*, 56 F.3d 669, 675 (5th Cir. 1995) (The deputies' conduct in abruptly awakening the defendant in the middle of the night to ask if they could enter the residence and refusal to leave the residence thereafter constituted a "show of authority" that was unreasonable.); *Harless v. Turner*, 456 F.2d 1337, 1338–39 (10th Cir. 1972) (per curiam) (No legally effective consent was given after a number of sheriff's deputies invaded the defendant's home in the middle of the night and forced the defendant and his wife out of bed.). That being said, however, we find that based upon the totality of the circumstances here, the fact that the search occurred at midnight does not by itself negate the voluntariness of Ramirez-Chilel's consent to search.

14

police officer followed the defendant's mother into her home when she went in to get a drink of water – we later determined that the mother's actions could not "be viewed as an adequate implied consent to that warrantless [entry]." *Id.* at 829. "[T]he government may not show consent to enter from the defendant's failure to object to the entry. To do so would be to justify entry by consent and consent by entry. This will not do." *Shaibu*, 920 F.2d at 1427.

However, after examining the facts in *Gonzalez* and comparing them to the case at hand, we can certainly make a distinction between the failure to object when officers follow someone into their home and the act of "yielding the right-of-way" to officers at the person's front door. Although the officers did not receive any explicit verbal consent from Ramirez-Chilel to enter, the officers did receive some sort of implied consent to enter from Ramirez-Chilel's body language that was not present in *Gonzalez*.

Therefore, we find the officers entry to be legal because we find no official show of force which would have "forced" the defendant to let the officers in, and we also find that Ramirez-Chilel demonstrated his consent to entry by "yielding the right-of-way" for the officers to enter.

### III.

After finding that the officers' entry was legal, we now need only determine

15

whether Ramirez-Chilel voluntarily gave his consent for the officers to search the premises.[9]

According to *United States v. Robinson*, 625 F.2d 1211, 1218 (5th Cir. 1980), "[t]he question of voluntariness is one of fact to be determined from the *totality of the circumstances*, and the trial court's voluntariness determination must not be reversed on appeal unless clearly erroneous."[10] In determining the voluntariness of a defendant's consent, we stated in *Gonzalez* that a court must look at several factors, which include whether the defendant was "free to leave," whether there was "coercive police procedure," "the extent of [the] defendant's cooperation or awareness of a [right to] refuse to consent," "whether [the defendant] could refuse to consent," the extent of the defendant's "education and intelligence," and the defendant's "belief that no incriminating evidence would be found." 71 F.3d at 830–31.

The facts in this case lead us to believe that Ramirez-Chilel's consent to

---

[9] Typically, if the ensuing search occurs after an initial illegality, such as an illegal entry or an illegal arrest, we must first determine whether the consent to search was voluntary and then, whether the consent was tainted by the initial illegality. *Santa*, 236 F.3d at 676; *United States v. Robinson*, 625 F.2d 1211, 1219 (5th Cir. 1980). In this case, the initial entry was determined to be legal, and therefore we need only address whether Ramirez-Chilel's subsequent consent to search was voluntary.

[10] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

16

search was voluntary – according to the officers' testimonies, Ramirez-Chilel was free to walk around his residence at all times, Agent Guillan spent over thirty minutes with the defendant, translating and reading the consent to search form before Ramirez-Chilel signed it, Ramirez-Chilel appeared to understand that he could refuse to consent (Guillan put a check mark next to each paragraph of the form which explained his right to refuse to consent), and, most importantly, Ramirez-Chilel himself admitted during the suppression hearing to consenting to the search because he knew he did not have any guns or "bad things" in the trailer.

Therefore, we find from the totality of the circumstances that Ramirez-Chilel's consent to the officers' search of his residence was voluntary, and therefore the motion to suppress all physical evidence found in his home that night was appropriately denied.

Finally, we need not examine whether the post-arrest statement was tainted as fruits of an initial illegality because we find no initial illegality, whether it be the initial entry or the ensuing search. We therefore affirm the district court's decision to deny the defendant's motion to suppress.

AFFIRMED.

17