[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 6, 2009
THOMAS K. KAHN
CLERK

No. 08-15148
Non-Argument Calendar

_____

D. C. Docket No. 08-20088-CR-DMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ANTHONY MILLER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 6, 2009)

Before BLACK, BARKETT and KRAVITCH, Circuit Judges.

PER CURIAM:

Anthony Miller appeals his conviction for possession of a firearm by a

convicted felon on the ground that the district court improperly denied his motion

to suppress. After a thorough review of the record, we affirm.

Miller was indicted for possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g). He moved to suppress the gun seized from his car during a traffic stop on the grounds that (1) there was no probable cause to conduct the stop; (2) without probable cause, there was no valid reason to search the car; and (3) even if there was probable cause to stop the car, there was no probable cause to believe contraband would be found in the car.

At the suppression hearing, Miami-Dade Police Detective William Kostopoulos testified that he and Detective Scott Brown were on patrol around 2 a.m. and had stopped their unmarked police car, equipped with red and blue lights, in the parking lot of a convenience store on Homestead Avenue. Dressed in police vests, the two officers were standing outside the car speaking with various people when they noticed a green Dodge Durango parked in the lot. The driver, later identified as Miller, looked in the officers's direction, started spinning the Durango's wheels, and quickly backed out of the lot, forcing pedestrians to jump out of the way to avoid being hit. The officers followed in their car down Homestead Avenue and observed Miller drive recklessly and run a stop sign before turning onto 174th Street and pulling into an apartment complex. Kostopoulos pulled in behind the Durango, turned on his high beams, and exited the police car.

2

As he approached the Durango, Kostopoulos noticed Miller reach down for something under the driver's seat. Kostopoulos approached the driver's side of the car with his weapon drawn and ordered Miller and an unidentified passenger to put their hands on the ceiling. Kostopoulos opened the door to enable Miller to exit the car and, while Miller was still seated, Kostopoulos observed the butt of a gun under the driver's seat. He informed Brown about the gun and removed Miller from the car to place him in custody. A records check confirmed that Miller had a felony record. Kostopoulos photographed the firearm beneath the seat after removing Miller from the car and before he secured the weapon.

On cross-examination, Kostopoulos admitted that his written reports noted that the convenience store was located on 100th Avenue, which he explained he believed to be the equivalent of Homestead Avenue. When defense counsel showed him a map, however, he conceded that the streets appeared to be different. Kostopoulos also admitted that his report erroneously indicated that police followed Miller down 172nd Street, but that the street name was also incorrect. Counsel then asked about the proper procedure for calling dispatch when conducting a stop. Kostopoulos stated that normal procedure is to contact dispatch and other officers about a reckless driver, and after observing a weapon, to request back-up and radio information about the weapon. In this case, Kostopoulos

3

explained, he called his sergeant when he made the arrest and later notified dispatch of the firearm even though he found the weapon in the first minute or two of the stop. He explained that the code for a firearm was "55."

Brown confirmed that he observed Miller driving recklessly. Brown also stated that he considered Homestead Avenue and 100th Avenue to be the same street. Brown further confirmed that he observed Miller reaching under the driver's seat when the officers stopped the car. Brown testified that he had approached the passenger side, instructed the passenger to exit the car, and observed the gun under the driver's seat. On cross-examination, Brown admitted that his report erroneously (1) stated that police followed Miller down 172nd Street, and (2) indicated that he (rather than Kostopoulos) found the firearm in the car. When questioned about proper procedure for calling dispatch, Brown explained that generally, police would let back-up know about a chase and would radio information about a gun immediately. He explained, however, that such calls did not always involve dispatch and may be made on tactical channels directly to other officers. In cases in which the officers communicate on tactical channels, the officers notify dispatch of new information later. Reviewing the events of Miller's arrest, Brown confirmed that there was little interaction with dispatch and they had informed other officers of the events on tactical channels.

4

According to a recording of the calls between the officers and dispatch, at 2:12 a.m. Kostopoulos notified dispatch of a traffic stop, code "19." He did not change the code to "55" for firearm until 25 minutes later. In the calls, neither Kostopoulos nor Brown mentioned reckless driving or a firearm when they radioed dispatch at the time of the stop.

Sergeant Joseph Deegan confirmed that he heard Brown and Kostopoulos on the tactical channels, but testified that he only learned of the firearm when he arrived at the arrest scene.

Based on the testimony and evidence, the magistrate judge found there was probable cause to stop Miller's vehicle for a traffic violation and once the stop was conducted, police observed the firearm in plain view. The magistrate judge concluded that the officers' testimony was credible and noted that there had been no rebuttal evidence. The magistrate judge then explained that the alleged inconsistencies were not relevant to the issue of probable cause, and the fact that the officers did not notify dispatch of the signal code for a firearm was reasonable under the circumstances. Accordingly, the magistrate judge recommended the district court deny the motion to suppress.

In his objections to the recommendation, Miller argued that the officers lacked credibility. The district court adopted the recommendation after reviewing

the transcripts, the record, and "all other pertinent documents." Thereafter, Miller entered a conditional plea in which he reserved the right to challenge the denial of the motion to suppress the firearm. The court sentenced Miller to thirty months' imprisonment. This appeal followed.

Miller argues that the police lacked probable cause to stop his vehicle and the firearm was not in plain view. He contends that the officers' testimony was not credible, as it was contradicted by the police reports and the transcripts of the radio calls and was implausible on its face.

"A district court's ruling on a motion to suppress presents a mixed question of law and fact." United States v. Zapata, 180 F.3d 1237, 1240 (11th Cir. 1999). We accept the district court's findings of fact to be true, unless shown to be clearly erroneous, and review de novo the district court's application of the law to those facts. Id. "[A]ll facts are construed in the light most favorable to the prevailing party below." United States v. Bervaldi, 226 F.3d 1256, 1262 (11th Cir. 2000).

Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is in a better position to assess the credibility of witnesses. United States v. Ramirez-Chilel, 289 F.3d 744 (11th Cir. 2002). "In other words, we must accept the evidence unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no

6

reasonable factfinder could accept it." Id. (citation omitted). Accordingly, in evaluating the factual version of events, we defer to the magistrate judge's determinations unless his understanding of the facts appears to be "unbelievable." Id.

Upon review, we conclude there is no reason to disturb the magistrate judge's credibility findings, as nothing in the record indicates the findings were improbable on their face or so inconsistent that no fact finder could accept them. Notably, the only evidence offered to rebut the officers' testimony was a transcript of the police radio calls and errors in the police reports.

Contrary to Miller's argument, the errors in the police reports were minor and do not call into question whether the police had probable cause to stop the vehicle. The officers testified that they observed Miller spin his tires and quickly leave the parking lot, forcing pedestrians to jump out of the way. They also observed Miller run a stop sign. The fact that the report erroneously identified the street on which Miller was driving is not relevant to these facts.

Furthermore, the transcripts of the calls do not establish that the officers' testimony was either inconsistent or incredible. Although the officers admitted that they would normally radio in that they were following a reckless driver and would immediately notify other officers that a gun was involved, the officers

explained that often calls were routed through tactical channels rather than dispatch. Deegan confirmed that he heard Brown and Kostopoulos reporting on the tactical channels, although he could not remember any mention of a firearm and only learned of the gun when he arrived on the scene. Nevertheless, Deegan's testimony confirmed that the calls to dispatch were not the only calls the officers made that night and lends support for the officers' explanations of why the transcripts do not include any mention of reckless driving or the firearm. Thus, we defer to the magistrate judge's credibility finding.

Assuming, then, that the officers were credible, the issue is whether the police had probable cause to stop Miller's car. A decision to stop a vehicle is reasonable under the Fourth Amendment where an officer has probable cause to believe that a traffic violation occurred. United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999); see also Whren v. United States, 517 U.S. 806, 809-10, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996). Where an initial traffic stop is legal, however, the officer has "the duty to investigate suspicious circumstances that then [come] to his attention." United States v. Harris, 928 F.2d 1113, 1117 (11th Cir. 1991).

Here, the police testified that they observed Miller drive recklessly and ignore a stop sign. Thus, they had probable cause to stop the car. See Fla. Stat.

8

Ann. § 316.192 (making it unlawful to drive a vehicle with "willful and wanton disregard for the safety of persons," and identifying fleeing a police officer as "reckless driving per se.").

The officers further testified that they observed the gun in plain view. The "plain view" doctrine allows a warrantless seizure where "(1) an officer [was] lawfully located in the place from which the seized object could be plainly viewed and [had] a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent." United States v. Smith, 459 F.3d 1276, 1290 (11th Cir. 2006). Miller's assertion that the police could not have seen the firearm and that the gun must have been under the passenger's seat is pure speculation and there is no evidence to support such a claim.

Accordingly, because there is no basis to overturn the magistrate judge's credibility determinations, the evidence established probable cause to stop the vehicle, and that the firearm was in plain view, we AFFIRM the district court's denial of the motion to suppress.

**AFFIRMED**.