[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 25, 2011
JOHN LEY
CLERK

No. 10-11527
Non-Argument Calendar

_____

D.C. Docket No. 3:03-cr-00149-RV-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MICHAEL D. ROBINSON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(May 25, 2011)

Before EDMONDSON, HULL and PRYOR, Circuit Judges.

PER CURIAM:

Michael Robinson appeals the revocation of his supervised release, pursuant to 18 U.S.C. § 3583(e)(3). Robinson argues that the district court violated his due process rights when it admitted hearsay evidence at his revocation hearing. After review, we affirm.

## I. BACKGROUND

**A.      Petition for Revocation of Supervised Release**

In April 2004, after pleading guilty, Robinson was convicted of conspiracy to distribute and possess with intent to distribute cocaine and cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(ii)-(iii) and 846. Robinson received a 60-month sentence, followed by 48 months of supervised release. On June 6, 2008, Robinson began serving his supervised release term.

On March 18, 2010, the Probation Office filed an amended petition for revocation of Robinson's supervised release, alleging three violations. Violation One alleged that Robinson was arrested and charged with committing various crimes against his wife, Likeisha Goldsmith-Robinson, including, inter alia, domestic violence, aggravated assault and discharging a firearm in public.

Violations Two and Three alleged that Robinson used marijuana and associated with a convicted felon while on supervised release, respectively.[1]

### B.    Revocation Hearing

At a revocation hearing, the district court heard testimony from two officers with the Escambia County Sheriff's Office. On February 1, 2010 at 3:00 a.m, the officers were dispatched to an intersection where shots had been fired. The officers found Goldsmith-Robinson, Defendant Robinson's wife, in her car, crying and hysterical. The driver's side of Goldsmith-Robinson's car was damaged. A red bumper lay in front of her car. Two bullet holes were found on the passenger side of the vehicle and a bullet fragment was found on the passenger side floorboard.

Over Defendant Robinson's hearsay objection, the officers testified about Goldsmith-Robinson's statements to them at the scene. Goldsmith-Robinson told the officers that after she left a nearby club, a red Ford truck pulled up next to her car. Defendant Robinson and an unknown female were inside the truck and a verbal altercation began. When Goldsmith-Robinson tried to leave, her car was

---

[1]On appeal, Defendant Robinson challenges the revocation of his supervised release with respect to Violation One. He does not challenge Violations Two and Three, and we do not address them further.

rammed by the truck. Defendant Robinson exited the truck and attempted to enter the passenger side of Goldsmith-Robinson's car, but failed because the doors were locked. Defendant Robinson then fired a revolver twice into Goldsmith-Robinson's car, returned to the truck and left.

The officers described Goldsmith-Robinson as "very scared, "visibly shaking," "crying uncontrollably" and "clearly upset." Neither officer believed Goldsmith-Robinson was intoxicated. Goldsmith-Robinson told the officers she believed Defendant Robinson was going to kill her and that he had told her he would kill her if she got him in trouble by going to the police. Goldsmith-Robinson indicated that Defendant Robinson had waited at her house and threatened her with a gun once before.

Also over Defendant Robinson's hearsay objection, the district court admitted Goldsmith-Robinson's sworn written statement given to the officers at the scene. In the statement, Goldsmith-Robinson recounted that Defendant Robinson and a "lady friend" pulled up from behind and started to argue with her and rammed her car. Then, Defendant Robinson got out and walked to Goldsmith-Robinson's car and shot at it twice. Goldsmith-Robinson averred that Defendant Robinson was "very violent," that she feared for her life and the safety of her

4

children and that Defendant Robinson had told her if she "ever Put Him in Jail He would Kill me or Have me Killed."

The government introduced the red front bumper recovered from the collision scene. The district court noted that only the right side of the bumper was damaged. The government introduced photographs of the collision scene, the recovered bullet and the testimony of a crime scene technician who: (1) found Goldsmith-Robinson's car on the right-hand side of the road, with the red bumper directly in front of it; (2) observed two new bullet holes in the lower part of the passenger-side door to Goldsmith-Robinson's car; (3) recovered one bullet from the passenger side floorboard; (4) could not find an exit hole for the second bullet, which indicated the bullet remained in the door casing; and (5) did not find any shell casings, which was consistent with the use of a revolver.

John Dickinson, a Florida Assistant State Attorney, testified that he dismissed the state charges against Defendant Robinson after Goldsmith-Robinson recanted her story under oath. The dismissal stated that Goldsmith-Robinson had denied that "Robinson was present at the time that an unknown female rammed her vehicle and shots were fired," denied that "anyone got out of the assailant's vehicle and further claims that the shots were heard at the time that her vehicle was actually being rammed." The dismissal noted that "[t]here is no explanation

5

as to how bullet damage was caused to the passenger side of her vehicle. (The opposite side of the vehicle was rammed.) Goldsmith-Robinson claims that she had been drinking 'a whole lot' that evening and can only assume that she made the accusations as originally reported."

Dickinson testified that, in his experience, it was common for female domestic violence victims to recant their accusations. Dickinson did not believe Goldsmith-Robinson's recantation because it did not correspond to the investigative facts. Nonetheless, Dickinson dismissed the case because it is "very difficult to go forward in domestic violence cases where your victim is not cooperative" and "they don't make themselves available for process."

The district court also heard testimony from three individuals who claimed to be in the red truck when the incident occurred—Shervonne Lee, Defendant Robinson's girlfriend; Anita Lee, Shervonne's mother; and Dimitri Bryant, Shervonne's cousin and Anita's nephew. According to these witnesses, Anita Lee rented the red truck. Shervonne Lee was driving and Dimitri Bryant and Anita Lee were riding as passengers when Goldsmith-Robinson struck the truck with her car. They denied that Defendant Robinson was in the truck or that anyone in the truck shot at Goldsmith-Robinson.

According to Anita Lee, Goldsmith-Robinson ran to the front of the truck and yelled at Shervonne Lee because she mistook Dimitri Bryant for her husband, Defendant Robinson. When Bryant got out of the truck to show Goldsmith-Robinson that he was not Defendant Robinson, Goldsmith-Robinson fled the scene. Anita Lee explained that she did not call the police because she hoped to settle it between them and that she did not realize the bumper was missing until the next morning.

Shervonne Lee testified that she was driving the red truck up to a left turn lane at a light when a car driven by Goldsmith-Robinson came around the right-hand side and rammed into the side of the truck. Goldsmith-Robinson then drove through the light, turned around and returned. Goldsmith-Robinson rolled down her passenger-side window and started yelling at them. Although Shervonne Lee knew Defendant Robinson was married, she did not know that the woman in the other car was his wife until Bryant said, "That's Michael's wife." When Bryant opened up the truck and got out, Goldsmith-Robinson sped off. Shervonne Lee did not call the police when the incident happened because she panicked.

The next morning, Shervonne Lee realized the bumper had come off the truck. She and Anita Lee went to the police station, but Anita Lee did not want to

file criminal charges because she preferred not to get involved and to pay the cost of the repairs herself.

Dimitri Bryant's testimony of the incident was similar to that of Anita and Shervonne Lee. Bryant saw Goldsmith-Robinson two weeks before the incident when he took Defendant Robinson in the truck to sign some divorce papers. Bryant recognized Goldsmith-Robinson once he got out of the truck after the collision. He believed Goldsmith-Robinson thought he was her husband. However, he did not tell Anita and Shervonne Lee that the driver was Robinson's wife until later that morning.

David Alverson, a defense investigator and former narcotics police officer, testified that he interviewed Goldsmith-Robinson on March 27, 2010, four days before the revocation hearing. Goldsmith-Robinson told Alverson: (1) she was drinking on the night of the incident because she recently discovered her husband was involved with another man; (2) when she left the club, she was intoxicated, and her car was struck by another vehicle; (3) she could not identify who was in the other vehicle or account for the bullet holes or broken window in her car; (4) the police report of the incident was inaccurate; (5) she was not afraid of Defendant Robinson; and (6) she did not intend to go to Robinson's revocation hearing because she feared the criminal justice system. Alverson testified, based

8

on his experience, that it was not common for a woman to recant her accusations of domestic violence.

Robinson obtained a subpoena for Goldsmith-Robinson to appear at the revocation hearing. The U.S. Marshals Service tried repeatedly to serve Goldsmith-Robinson with the subpoena, but was unsuccessful. Each time, the Marshal left a note advising Goldsmith-Robinson of the attempted service. The morning of the hearing, a U.S. Marshal spoke with Goldsmith-Robinson, who said she would not attend the hearing because she feared the criminal justice system. During the hearing, Marshals continued trying to locate Goldsmith-Robinson without success.

The prosecutor stated that he had not tried to get Goldsmith-Robinson to the revocation hearing because she had recanted out of fear. The prosecutor asked the district court to rely upon Goldsmith-Robinson's hearsay statements instead. The district court issued a bench warrant for Goldsmith-Robinson's arrest and recessed to give the Marshals a chance to find her. The Marshals Service entered the warrant into the relevant database, notified local law enforcement who patrolled Goldsmith-Robinson's neighborhood, interviewed Goldsmith-Robinson's neighbors and attempted a "ruse call" to get Goldsmith-Robinson to leave her house, all to no avail. When the hearing reconvened the next day, the district

court withdrew the warrant, partly because the parties agreed Goldsmith-Robinson would likely claim her Fifth Amendment privilege to remain silent.

Defendant Robinson testified that he was not in the red truck that collided with his wife's car. At the time, he was at his grandmother's house. Robinson said that before the incident he and his wife had argued about Robinson's alleged girlfriends. Robinson admitted cheating on his wife with Shervonne Lee. Robinson believed his wife rammed the red truck because she could get hysterical and not think clearly. Robinson did not know how the bullet holes got in the car.

During cross-examination, the government asked Robinson about two prior domestic violence incidents listed in his Presentence Investigation Report in which the battery charges against Robinson were dismissed. Robinson explained that the type of women he has become involved with "just get real emotional, they can't dictate or control their feelings" and "they get upset with me, and they get obsessed with me, and those are the things they do." Robinson maintained that the women had accused him of things he had not done and that he did not coerce any of them to drop the charges.

## C. District Court's Ruling

At the close of the hearing, the district court found that sufficient efforts had been made to try to bring Goldsmith-Robinson to the hearing. The district court

concluded that the officers' testimony about Goldsmith-Robinson's statements was admissible. The district court found that Goldsmith-Robinson's hearsay statements on the night of the collision were "extremely reliable" and that her later recantation was "highly suspect" and "done under duress and fear." The district court found that recantations by domestic violence victims are common and stressed that two prior battery charges against Robinson were dismissed after the victims recanted. Conducting the balancing test from United States v. Frazier, 26 F.3d 110 (11th Cir. 1994), the district court concluded that the hearsay evidence's reliability outweighed Robinson's right to confrontation. The district court emphasized that Robinson had ample opportunity to cross-examine all the witnesses and interviewed Goldsmith-Robinson through his attorney and investigator. The district court alternatively concluded that the hearsay statements could be admitted under the excited utterance exception.

The district court credited the officers' testimony and discredited the testimony of Robinson, Bryant and Anita and Shervonne Lee based on the physical evidence and their personal interest in the case's outcome. The district court found Robinson guilty of all three alleged violations, revoked his supervised release and sentenced him to 46 months' imprisonment.

11

Robinson objected to the admission of Goldsmith-Robinson's hearsay statements, arguing that the district court had failed to evaluate under the Frazier balancing test whether the government had given a good reason for not producing Goldsmith-Robinson at the hearing. The district court reiterated its finding that Goldsmith-Robinson's statements at the scene of the collision were reliable and that her later recantation did not negate their reliability given "that she is an assault victim, that it's common for assault victims to be intimidated by threats from the assaulter," and that "Robinson has a long record of having done that with at least two other previous victims." Robinson filed this appeal.

## II.  DISCUSSION

Under 18 U.S.C. § 3583(e), a district court may revoke a defendant's term of supervised release and impose a prison sentence when it finds by a preponderance of the evidence that the defendant violated a condition of his supervised release. 18 U.S.C. § 3583(e)(3); see also United States v. Sweeting, 437 F.3d 1105, 1107 (11th Cir. 2006). We review a district court's revocation of supervised release for an abuse of discretion. United States v. Velasquez Velasquez, 524 F.3d 1248, 1252 (11th Cir. 2008). In reviewing a revocation proceeding, we are bound by the district court's findings of fact unless they are clearly erroneous. United States v. Almand, 992 F.2d 316, 318 (11th Cir. 1993).

12

Although the Federal Rules of Evidence do not apply in supervised release revocation hearings, hearsay is not automatically admissible because defendants are entitled to certain minimal due process requirements, including "the right to confront and cross-examine adverse witnesses." Frazier, 26 F.3d at 114. In deciding whether to admit hearsay testimony in a revocation hearing, the district court "must balance the defendant's right to confront adverse witnesses against the grounds asserted by the government for denying confrontation," and must find that the hearsay statement is "reliable." Id. Failure to apply the balancing test constitutes error, but this Court will not reverse the district court if the error was harmless. See id.

We conclude that the district court did not abuse its discretion or violate Defendant Robinson's due process rights in admitting Goldsmith-Robinson's hearsay statements. The district court properly balanced Robinson's right to confront Goldsmith-Robinson against the government's reasons for not producing her live testimony, and found the hearsay statements reliable based on the testimony of witnesses and the corroborative physical evidence. The record demonstrates that the U.S. Marshals made numerous attempts to secure Goldsmith-Robinson's presence at the hearing, as did the district court, and that Goldsmith-Robinson was evading service of the subpoena. As the district court

13

noted, Robinson had ample opportunity to interview Goldsmith-Robinson and presented investigator Alverson's testimony about the substance of that interview and Assistant State Attorney Dickinson's testimony as to her sworn recantation.

The record supports the district court's conclusion that Goldsmith-Robinson's original statements to law enforcement were reliable, while her later recantation was likely the product of duress and fear. In particular, the physical evidence corroborated Goldsmith-Robinson's original statements and contradicted her recantation. Further, Goldsmith-Robinson expressed genuine fear for her life at the time of the statements. In light of her fear of Robinson and Robinson's two prior domestic abuse charges that were dismissed, her recantation was highly suspect. Assistant State Attorney Dickinson testified that domestic violence victims often recant, something the district court noted was confirmed by its own experience. Moreover, the district court credited the officers' testimony and found that Robinson, Bryant and Shervonne and Anita Lee had all committed perjury, pointing out that their testimony did not correspond to the evidence. Robinson offers no basis for disregarding the district court's credibility findings. See United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002) (explaining that we defer to the district court's credibility determinations unless its understanding of the facts "appears to be 'unbelievable'").

In addition, even though the proceedings were not governed by the Federal Rules of Evidence, the district court correctly observed that Goldsmith-Robinson's hearsay statements were admissible as excited utterances under Federal Rule of Evidence 803(2). See Fed. R. Evid. 803(2) (providing that a hearsay statement is admissible if it is one "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition"). Goldsmith-Robinson made the statements to the officers immediately after, and while still under the stress of, the startling confrontation with Defendant Robinson. See United States v. Belfast, 611 F.3d 783, 817 (11th Cir. 2010) (explaining that "the excited utterance need not be made contemporaneously to the startling event," so long as the hearsay declarant is still "under the stress or excitement that the startling event caused"), cert. denied, 131 S. Ct. 1511 (2011). Thus, under the totality of circumstances, even assuming the district court failed to conduct a proper Frazier test, the hearsay met the higher standard for admissibility under the Federal Rules of Evidence, and any alleged error in the Frazier balancing test was harmless.

**AFFIRMED.**

15