[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-15999
Non-Argument Calendar
_____

D.C. Docket No. 2:05-cr-14057-KMM-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

DAVID LEE BROWN,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(May 23, 2013)

Before TJOFLAT, WILSON and PRYOR, Circuit Judges.

PER CURIAM:

David Lee Brown appeals the revocation of his supervised release and the resulting imposition of his 24-month sentence, pursuant to 18 U.S.C. § 3583(e). On appeal, Brown first argues that there was insufficient evidence to show that he violated a condition of his supervised release by committing burglary with assault under Florida Statute § 810.02(2)(a). Second, Brown contends the district court's sufficiency of the evidence error resulted in an incorrect calculation of his sentence, rendering it procedurally unreasonable. Finding no error on the part of the district court, we affirm.

## I.

In January 2006, Brown was convicted of (1) possession of counterfeit obligations, and (2) attempt to utter counterfeit obligations, both in violation of 18 U.S.C. § 472. The district court sentenced Brown to 60 months' imprisonment and three years' supervised release as to each count, to run concurrently. Brown's supervised release was conditioned upon, *inter alia*, his abstention from further criminal activity.

Brown's term of supervision commenced on December 10, 2009. In June 2012, however, his probation officer filed a "Petition for Warrant or Summons for Offender under Supervision," claiming that Brown violated the mandatory conditions of his supervised release by committing several crimes: (1) assault, in violation of Florida Statute § 784.011; (2) battery, in violation of Florida Statute §

2

784.03; and (3) burglary of a dwelling or structure with assault, in violation of Florida Statute § 810.02(2)(a).[1]

At the final hearing, the government proffered two witnesses to testify regarding Brown's alleged burglary with assault violation: Deputy Sheriff Matthew Hurst and Tanya Collins, the alleged victim. Hurst testified that at approximately 3:00 a.m. on May 27, 2012, he responded to a 911 call made from an apartment in Okeechobee County, Florida, by a woman who stated that she woke up to find four men in her apartment and that an assault occurred. After arriving at the scene, Hurst encountered an upset and crying Collins in the parking lot of the apartment complex; Collins was in sleeping attire, smelled of alcohol, and appeared to be intoxicated. Despite her intoxication, Collins was coherent and had no problems answering the background questions that Hurst posed.

Collins told Hurst that she had been out drinking on the evening of May 26, returned to her apartment, and went to bed. In the wee hours of the morning, she awoke to find four men in her bedroom; her undergarments had been pulled off and two of the men were trying to take off the rest of her clothing. She identified two of the men as Livan Ramos, whom she had formerly dated, and Daniel Salazar, an old schoolmate. Collins did not know Brown at the time of the

---

[1] Brown only appeals the revocation of his supervised release with regard to the third violation of burglary with assault. Therefore, we need not consider the first two violations. *See Timson v. Sampson*, 518 F.3d 870, 874 (11th Cir. 2008) (per curiam) (holding that issues not briefed on appeal are deemed abandoned).

incident, but later identified him as one of the men in her bedroom.  She also did not know the name of the fourth man, but he was later identified as Jessie Lyng. Collins did not say that Brown had touched her, but complained repeatedly that Brown had urinated on her clean clothes stored in a hamper at the foot of her bed. Collins told Hurst that she had to physically fight the four men in order to get them out of her apartment.

Hurst returned later that day to conduct a second, follow-up interview with Collins.  Hurst testified that Collins was completely coherent and sober during the interview, and that her story was consistent with her initial complaint.  At that time, Collins signed a sworn statement.  While on the premises, Hurst also noticed that the screen had been removed from a small unlocked window beside the front door of Collins's apartment, which seemed to support Collins's explanation that she did not know how the men had gained entry; otherwise, there were no signs of forced entry.  The crime scene investigators collected Collins's undergarments and the clothing in the hamper, but Hurst did not know whether the clothing was tested for urine.

Hurst issued a radio dispatch for the suspects and a black Cadillac, and received word on the evening of May 27 that a man named Daniel Salazar was the subject of a traffic stop.  Hurst went to the site of the traffic stop, where he

4

encountered Ramos, Salazar, and Brown, all of whom voluntarily agreed to come to the Sheriff's Office to be interviewed.

During his interview, Brown explained that at about 2:30 a.m. on May 27, Ramos took the men to Collins's apartment to drink beer and "party." According to Brown, the three men were in the apartment when Collins went into the bedroom and then returned, yelling and screaming for them to leave. Apparently, Collins was so loud that Salazar urged them to leave before someone called the police. Brown insisted that he did not touch Collins or urinate on her clothing. Although he admitted that he had entered the apartment, he denied going into Collins's bedroom. The accounts given by Brown, Ramos, and Salazar were inconsistent in many ways, but were consistent in that none of them stated that Brown had entered Collins's bedroom.

Collins testified that she had reported an incident to the police and later gave written statements to both the police and an attorney.[2] She explained that she had

---

[2] Sometime after making her complaint, Collins indicated to Elissa Salazar, Daniel Salazar's wife, that she wanted to drop the charges because she was "tired of the scrutiny." Elissa Salazar took Collins to the office of Daniel Salazar's attorney, at which time Collins wrote a statement that she was not certain whether she had let the men into her apartment. There was also an allegation against Brown that he engaged in witness tampering and was going to pay Collins off, but Collins explained that Brown never asked her to give any particular testimony to the police or to prosecutors. Finally, the government filed a motion to dismiss the violation of supervised release petition because there was "insufficient evidence to support the allegations and the United States [could not] move forward in good faith." However, the district court denied the motion, ruling that the evidence was sufficient to proceed under the preponderance of the evidence standard required in violation of supervised release cases, regardless of whether the evidence was sufficient for a reasonable doubt-based criminal prosecution.

been drinking in the late afternoon and into the evening of May 26, but could not recall whether she had been drinking with friends or whether she had been drinking alone at home before going to bed.[3]  Collins recalled that Salazar and Ramos were in her bedroom trying to wake her up; a third man was near the bedroom door, and a fourth man—whom she later identified as Brown—was closer to the bed.  She recalled that Ramos grabbed her legs and Salazar held her right wrist, and that they told her to get up.  One of the men, whom she believed to be Ramos, yanked off her undergarments, tearing them.  After refreshing her memory with the written statement she gave to the police, she testified that Brown did not touch her. Collins testified that she never had any intention of engaging in sexual activity with any of the men.

Collins testified that she got up, attempted to find clothes to cover herself, and yelled at the men to leave; she then observed Brown urinating on her clothing. She stated that she had to physically fight the men to get them to leave, and believed that she slapped Brown and Ramos, but that Brown did not hit her.  At that time, Lyng told the other men that they should leave because a neighbor was calling the police.  Collins recalled that the men departed in a big car, dark blue or

---

[3] In response to questions posed by the court, Collins stated that she began drinking at her apartment later in the afternoon on May 26, after a friend drove her home from her father's house.  She did not recall leaving her apartment after that and, to the best of her recollection, she drank alone at home until she went to bed.  She also did not recall inviting anyone into her apartment.

black, possibly a Cadillac.  Subsequently, she ran to a neighbor's apartment to call the police.

Collins conceded that she was very intoxicated[4] that night, and thus could not recall whether the men entered the apartment on their own or whether she let them in.  She also admitted that she did not know if the front door had been locked and conceded that it was possible that she had removed the screen from the window by her front door.  On cross-examination, Collins also stated that she was unsure if the men came through the window.  However, she insisted that her in-court testimony was accurate, regardless of what she had said in prior statements.

The district court found, by a preponderance of the evidence, that Brown had committed the first two violations of assault and battery, but noted that the burglary with assault violation presented a "closer question."  Nevertheless, the court found that Collins had been a very "truthful and candid and credible witness" in openly acknowledging her questionable recollection of certain events, and ultimately concluded, by a preponderance of the evidence, that Brown had unlawfully entered the apartment and was guilty of burglary with assault.

Based on a criminal history category of V, as calculated in the Presentencing Investigation Report (PSI), and the categorization of burglary with assault as a Grade A violation, the district court stated that Brown's advisory guideline range

---

[4] Collins also explained that she had been diagnosed with bipolar disorder when she was a teenager and that she took medications for that condition, as well as for anxiety.

7

was 30 to 37 months' imprisonment.  The court also noted that the mandatory statutory range for Brown's violation of supervised release was 0 to 24 months. The court confirmed that violations one and two were Grade C violations, with a guideline range of 7 to 13 months' imprisonment, but that the highest grade, Grade A, applied to the calculation of his guideline range.   The court ultimately sentenced Brown to 24 months' imprisonment.  Brown objected to the court's determination that he was guilty of the three violations.  This appeal followed.

## II.

On appeal, Brown argues that the government failed to prove by a preponderance of the evidence that he committed burglary with assault. Specifically, he maintains that there was no sign of forced entry into Collins's apartment and that Collins admitted that she might have let Brown and his companions into her apartment.  Further, even if there was sufficient evidence to prove burglary, there was no evidence that Brown entered the apartment with the intent to commit assault or battery or that, once inside, he battered or assaulted Collins.

We "review a district court's revocation of supervised release for an abuse of discretion." *United States v. Cunningham*, 607 F.3d 1264, 1266 (11th Cir. 2010) (per curiam).  A district court's findings of fact during a revocation of supervised release proceeding are binding unless clearly erroneous.  *United States*

*v. Almand*, 992 F.2d 316, 318 (11th Cir. 1993).  We accept a district court's credibility determination unless it is "contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it."  *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002) (internal quotation marks omitted).  In reviewing a sufficiency of the evidence challenge in a criminal action, we also accept reasonable inferences made by the factfinder.  *United States v. Hope*, 901 F.2d 1013, 1021 (11th Cir. 1990) (per curiam).

A district court may revoke a defendant's term of supervised release if the court "finds by a preponderance of the evidence that the defendant violated a condition of [his] supervised release."  18 U.S.C. § 3583(e)(3); *see United States v. Trainor*, 376 F.3d 1325, 1331 (11th Cir. 2004) (explaining that the preponderance of the evidence standard requires only that the trier of fact believe that "the existence of a fact is more probable than its nonexistence" (internal quotation marks omitted)).  "[A]n explicit condition of supervised release[] [is] that the defendant not commit another Federal, State, or local crime during the term of supervision."  18 U.S.C. § 3583(d); *see* U.S.S.G. § 7B1.1 cmt. n.1 ("[A] mandatory condition of . . . supervised release is that the defendant not commit another federal, state, or local crime.").  Determining whether a defendant violated a condition of his supervised release depends on his actual conduct, not whether he was charged with, or convicted of, a crime.  U.S.S.G. § 7B1.1 cmt. n.1.

9

Here, we hold that the evidence before the district court was sufficient to find, by a preponderance of the evidence, that Brown's conduct comprised the offense of burglary with assault; therefore the district court did not abuse its discretion in concluding that Brown violated the conditions of his supervised release. Once again, Brown's supervision was conditioned, in part, upon his abstention from committing any federal, state, or local crimes. *See* 18 U.S.C. § 3583(d); U.S.S.G. § 7B1.1 cmt. n.1. Pursuant to Florida Statute § 810.02(2)(a), burglary is a first-degree felony punishable by a term of years, not exceeding life imprisonment, if the offender assaults or batters any person in the course of committing the burglary. Fla. Stat. § 810.02(2)(a). Florida law defines "burglary" as "[e]ntering a dwelling, a structure, or a conveyance with the intent to commit an offense therein, unless the premises are at the time open to the public or the defendant is licensed or invited to enter." Fla. Stat. § 810.02(1)(b)(1). "Assault" consists of "an intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent." Fla. Stat. § 784.011(1).

As a preliminary matter, we give substantial weight to the district court's unique ability to evaluate Collins's credibility as a witness. *See Ramirez-Chilel*, 289 F.3d at 749. Although the district court acknowledged that Collins was not an

ideal witness, based on her intermittent recollection and occasionally inconsistent statements, Collins never wavered on two important facts: that Brown had been in her bedroom while two of his companions attacked her and that, while there, Brown urinated on her laundry after she told the men to leave. Accordingly, the district court's decision to credit Collins's testimony was not "so inconsistent or improbable on its face that no reasonable factfinder could accept" that determination. *See id.*

As to the elements of burglary, the court did not abuse its discretion in concluding that Brown committed the crime. Despite Collins's intermittent recollection, it was not clearly erroneous for the court to find that Collins was incapacitated and likely in no condition to admit the men into her home. Further, Brown's intent to commit a felony upon entering the residence can be reasonably inferred from his presence in the bedroom and his proximity to the bed during Collins's attack. *See Hope*, 901 F.2d at 1021. The court's findings that Collins did not let the men into her apartment, combined with the uncontroverted fact that the men were present in Collins's apartment on the night in question, were sufficient to prove burglary by a preponderance of the evidence. *See* Fla. Stat. § 810.02(1)(b).

In addressing whether there was an assault, the district court also credited Collins's testimony, and did not clearly err in finding that Brown was in the bedroom while Collins was being attacked. Brown's statement that he was in

11

Collins's apartment to "party," his proximity to the bed during Collins's attack, and his decision to urinate on her clothes after she told the men to leave evidenced Brown's threat, apparent ability, and intent to do Collins harm. Moreover, the fact that Collins did not know Brown and that she reacted so strongly to the unexpected presence of the men in her bedroom and, specifically, to Brown urinating on her laundry, demonstrated that Collins had a well-founded fear for her safety. Thus, the evidence presented by the government was sufficient to prove assault by a preponderance of the evidence. *See* Fla. Stat. § 784.011(1).

Accordingly, the district court did not abuse its discretion in concluding by a preponderance of the evidence that Brown committed burglary with assault, in violation of his supervised release conditions. We therefore affirm.

III.

Brown subsequently argues that his sentence was procedurally unreasonable because the district court incorrectly calculated his sentence. Specifically, Brown contends that the court erred by calculating his guideline range using the Grade A supervised release violation of burglary with assault, even though the government failed to sufficiently prove the violation; thus, his sentence was procedurally unreasonable.

Procedural reasonableness includes accurately calculating the applicable guideline range. *Gall v. United States*, 552 U.S. 38, 51, 128 S. Ct. 586, 597

12

(2007). A district court's interpretation of the Sentencing Guidelines is normally reviewed de novo, and its factual findings are reviewed for clear error. *United States v. Valnor*, 451 F.3d 744, 750 (11th Cir. 2006).

The guideline range for a sentence imposed upon the revocation of supervised release is determined by the grade classification of the most serious violation for which the supervised release was revoked, combined with the criminal history category that was "applicable at the time the defendant originally was sentenced to a term of supervision." U.S.S.G. §§ 7B1.1(a)(1), (b), 7B1.4(a). Of the three grades of supervised release violations provided under § 7B1.1(a), Grade A violations are the most serious and involve conduct that constitutes "a federal, state, or local offense punishable by a term of imprisonment exceeding one year that . . . is a crime of violence," or any other federal, state, or local crime punishable by a prison term exceeding 20 years. *Id*. § 7B1.1(a)(1).

Brown does not allege that his offense is neither a crime of violence nor punishable by a prison term exceeding 20 years. *See id*. Instead, Brown's procedural argument depends entirely on the success of his sufficiency of the evidence claim. As we explained above, the district court did not abuse its discretion by finding sufficient evidence to support Brown's burglary with assault violation. Thus, the court did not err by calculating his guideline range using the

13

Grade A classification.  Accordingly, we affirm both the revocation of Brown's supervised release and the sentence imposed for that violation.

**AFFIRMED.**