Abel RIZO, Petitioner-Appellant,

v.

UNITED STATES of America, Respondent-Appellee.

No. 15-10679

Non-Argument Calendar

United States Court of Appeals, Eleventh Circuit.

December 1, 2016

Rhonda Anne Anderson, Rhonda A. Anderson, PA, Coral Gables, FL, for Petitioner-Appellant

Carol Herman, Wifredo A. Ferrer, Kathleen Mary Salyer, Emily M. Smachetti, U.S. Attorney's Office, Miami, FL, Russell R. Killinger, U.S. Attorney's Office, Fort Pierce, FL, for Respondent-Appellee

Before TJOFLAT, JILL PRYOR and FAY, Circuit Judges.

**PER CURIAM:**

Abel Rizo appeals denial of his 28 U.S.C. § 2255 motion to vacate, set aside, or reduce his sentence, following an evidentiary hearing on remand. We affirm.

## I.  BACKGROUND

### A.  Underlying Criminal Case

Rizo emigrated from Cuba to the United States with his family as a child and settled in Miami, Florida. From August 1992 to May 1996, Rizo attended Lambuth University in Jackson, Tennessee, on a football scholarship. Rizo was arrested for drug, firearm, robbery, and conspiracy crimes in June 1996. There were fourteen codefendants, including his father, mother, and brother. Rizo and his codefendants allegedly were members of a criminal enterprise involved in robbing and extorting drug traffickers. The indictment implicated Rizo in four robberies. As an overt act in furtherance of the conspiracy, it alleged several of Rizo's codefendants traveled to Puerto Rico in late July 1992 to obtain cocaine (the "Puerto Rico rip-off"), the proceeds of which were delivered to Rizo and his family. Rizo also was charged for a robbery on June 29, 1992 (the "Lozano robbery"), a robbery on April 30, 1993 (the "Cano robbery"), and a robbery on November 24, 1993 (the "De la Torre robbery").

Rizo initially was represented by Howard Sohn, but a conflict arose with his representation; on August 30, 1996, Lance Armstrong was substituted as Rizo's counsel. Rizo pled not guilty and proceeded to trial with five codefendants, including his father. At trial, a cooperating codefendant implicated Rizo in an uncharged robbery in late March 1994 (the "Carmelo robbery"). The jury found Rizo guilty on all eight counts with which he was charged.

Prior to sentencing, Rizo obtained new counsel. At the sentencing hearing in August 1997, Rizo sought to present alibi witnesses. The district judge permitted Rizo to proffer the proposed alibi testimony; the judge noted, however, the jury had convicted Rizo, and a sentencing hearing was not the appropriate forum for presenting an alibi defense. The judge also permitted Rizo to present alibi testimony concerning the Puerto Rico rip-off from his grandfather, Hinaico Velasquez, because Rizo was implicated in, but not charged with, that crime. Velasquez testified Rizo was living on his farm in July 1992. On cross-examination, Velasquez stated it was impossible to say whether Rizo actually lived on the farm for the entire month or spent every hour on the farm. The district judge sentenced Rizo to 468 months of imprisonment. Rizo appealed; we affirmed his conviction and sentence in April 2001. *United States v. Gallego*, 247 F.3d 1191 (11th Cir. 2001).

## B. § 2255 Motion and Initial Appeal

Rizo filed a § 2255 motion with supporting affidavits, which included a claim of ineffective assistance of counsel because of Armstrong's failure to call his alibi witnesses at trial. The government argued the statements of the proffered alibi witnesses failed to provide an alibi for Rizo; Armstrong had made a reasonable strategic decision to present a defense focused on discrediting the testimony of the government witnesses, rather than presenting an implausible alibi defense that was unlikely to succeed. A magistrate judge issued a Report and Recommendation ("R&R") and recommended Rizo's § 2255 motion be denied without holding an evidentiary hearing.

The district judge adopted the R&R over Rizo's objections and denied his motion; however, she granted him a Certificate of Appealability ("COA") on the question of whether the judge had erred in denying Rizo's alibi claim without holding an evidentiary hearing. On appeal, we vacated the denial of Rizo's § 2255 motion and remanded the case with instructions to hold an evidentiary hearing on Rizo's alibi claim. *Rizo v. United States*, 446 Fed. Appx. 264, 266 (11th Cir. 2011). We concluded the affidavits attached to Rizo's motion and the trial transcript did not conclusively establish Armstrong's failure to pursue the potential alibi witnesses did not prejudice Rizo's defense.

## C. Proceedings on Remand

### 1. Evidentiary Hearing

On remand, an evidentiary hearing was conducted before a magistrate judge. Victor Wallace, Rizo's former football coach, testified, in August 1996, he had sent a letter to Sohn, Rizo's first attorney, attached a copy of the 1994 spring football schedule, and stated he would be available to testify on Rizo's behalf. Wallace did not recall ever being contacted by Armstrong and testified he was never asked or subpoenaed to be a witness at trial. Wallace did not recall Rizo ever missing a practice. Wallace acknowledged his letter to Sohn had stated, unless Rizo was in his presence when the alleged crimes were committed, he could not testify to Rizo's innocence.

Eugene Poole, Rizo's roommate, testified he had seen Rizo every day while he was at Lambuth. Final exams took place at the end of April in 1993; the last day of exams was April 29, 1993. The day after exams ended, Poole and Rizo helped Rizo's girlfriend, Juliana Meadow, and her roommate move from their dorm room. Poole and Rizo left Lambuth around noon or 1 p.m. on April 30, 1993; Poole did not arrive at his home in Opa Locka, Florida, until the afternoon or evening the next day. Poole was not contacted by an attorney

regarding Rizo's case and had not seen Armstrong before the evidentiary hearing. Juliana contacted Poole in .1996 or 1997 about testifying on Rizo's behalf; Poole told her he was available to testify. On cross-examination, Poole stated he did not remember Juliana's providing him with the name or .contact information of any lawyers before or during the trial; Juliana, however, did contact him to testify at the sentencing hearing.

Sven Ouderdorp, Rizo's teammate, testified he saw Rizo "pretty much every day at practice," ate with him almost every day, and often saw him during his free time, when they were at Lambuth. Evidentiary Hr'g Tr. at 75 (July 26, 2012). Rizo was present at every football practice and weightlifting session. In March 1994, Ouderdorp saw Rizo every day, including during their spring break trip to Key Largo. They left Lambuth on March 5 and returned to Tennessee on March 13. During the trip, they went fishing and Ouderdorp went with Rizo to purchase an engagement ring for Juliana. Ouderdorp was not contacted by an attorney or investigator regarding Rizo during the relevant time period. After Juliana initially informed him of Rizo's arrest, she never contacted Ouderdorp about being a witness at trial. Juliana did have Ouderdorp's contact information at that time.

Kimberly Simmons Ingram testified Rizo had helped pack her car on Friday, April 30, 1993. Rizo and Poole came over that morning; Ingram had left campus before noon. When she left, Rizo and Poole were still on campus. Juliana contacted Ingram two or three times between May and December 1996 and asked her to contact Rizo's lawyer. Ingram attempted to contact Armstrong three or four times by telephone and left messages; Armstrong did not return her calls. After reviewing her affidavit to refresh her memory, Ingram testified she had attempted to contact Armstrong by fax, but she no longer had the fax. Ingram stated she would have been available to testify at trial. On cross-examination, Ingram clarified she began packing her car the afternoon before she left Lambuth in April 1993 and finished packing the morning of April 30, 1993. When she prepared her affidavit in 2003, Ingram acknowledged Juliana had given her the "time frames that [she] needed to put together." Id. at 107. Ingram could not explain why she did not include in her affidavit she had called Armstrong in addition to sending him a fax.

Mark Gadwell, Rizo's teammate, testified he had to make up a test on the morning of Wednesday, November 24, 1993, before going home for Thanksgiving. Gadwell left Lambuth with Rizo around noon. The drive from Lambuth to Boca Raton, Florida, where Gadwell lived, took longer than usual, because they were delayed in traffic because of construction on the highway; they did not arrive in Boca Raton until around 6:30 or 7:00 a.m. the following morning. Juliana contacted him to testify at Rizo's sentencing hearing; however, no one contacted him about testifying at trial.

Joe Meadow, Juliana's father, testified he first met Rizo in November 1993 during the Thanksgiving holidays. Meadow met Rizo at a football game the Friday after Thanksgiving, after which they went to dinner with ·a group of people. Meadow took Rizo back to his house briefly; he then drove Rizo to the home of his neighbor, Vine Turk, where Rizo spent the night. Meadow saw Rizo throughout the weekend until Rizo and Juliana went back to school that Sunday. Meadow did not remember the specific dates of the Thanksgiving holidays in 1993 but did remember the football game was on Friday night. Rizo also visited Meadow's home on

April 1, 1994, to ask if he could marry Juliana. Armstrong did not contact Meadow to testify at Rizo's trial; when Meadow asked Juliana if he needed to testify, Juliana told him Armstrong had said he did not need to testify.

Juliana testified she and Rizo were married from January 1996 to 2002. Juliana saw Rizo almost every day from the time they met in November 1992 throughout the spring term of 1993. Final exams took place during the last week of April in 1993; that Wednesday, April 28, was Juliana's birthday. She went to dinner with Rizo for her birthday at Rafferty's. The following evening, Juliana spent a couple of hours helping Ingram pack with Poole and Rizo; they finished packing the next morning, Friday, April 30, 1993. Ingram left when they finished packing, and Rizo and Poole left around noon.

Juliana's father picked her up from college to take her home for Thanksgiving in 1993; on Friday, November 26, 1993, Rizo came to visit her. Rizo had called her at 3:00 p.m. that afternoon from a hotel in Tuscaloosa, Alabama, to tell her he would be late getting to her house, because he had taken a wrong turn. That night, Rizo attended a football game with Meadow, after which he met Juliana and others for dinner. They went back to Meadow's house after dinner; her father told Rizo he would be sleeping at Turk's house. Juliana spent all of Saturday and Sunday with Rizo; on Sunday evening they drove back to Lambuth.

In March and early April 1994, Juliana saw Rizo every day except during spring break. The first day back at school after spring break was Monday, March 14, 1994, which Juliana remembered because it was the day she and Rizo were engaged. On April 1, 1994, Juliana and Rizo drove to her parents' house to announce their engagement. Juliana and Rizo returned to Lambuth the evening of April 3.

After Rizo was arrested and before Armstrong became his attorney, Juliana wrote a letter to Sohn and included copies of Rizo's transcripts from Lambuth. In September 1996, Juliana spoke to Armstrong and told him Rizo had been in school during the charged crimes and would have possible alibi witnesses, who could testify on his behalf. Juliana spoke to Armstrong again in December 1996 and identified her father, her brother, Turk, Gadwell, Ingram, Poole, Ouderdorp, and Joachim Salo, a teammate of Rizo, as alibi witnesses. In January 1997, Juliana met Armstrong at his office and again discussed potential alibi witnesses. Prior to trial, Juliana contacted all of the witnesses she had identified to Armstrong to see if they were available to testify. Juliana also confronted Armstrong during the trial about presenting alibi testimony; Armstrong told her it was too late to present an alibi defense. She specifically asked Ingram to contact Armstrong; Ingram later told Juliana Armstrong did not contact her.

On cross-examination, Juliana admitted she never had provided Armstrong with the letter she had written to Sohn. She also confirmed she had not found a copy of the fax she sent to Armstrong with the witnesses' names and contact information. Juliana acknowledged she had attended Rizo's trial but never complained to the judge or any of the other attorneys about Armstrong's failure to contact the alibi witnesses.

Rizo testified he spent the summer of 1992 at his grandfather's farm. Final exams took place during the last week of April 1993. April 28 was Juliana's birthday and Rizo took her to dinner at Rafferty's. Rizo's last exam was on April 29, after which he went to see Juliana; he and Poole

helped Ingram, Juliana's roommate, pack. On April 30, 1993, Rizo and Poole finished packing their dorm room, then went to Juliana's room and helped carry the last of Ingram's boxes to her car. Rizo and Poole left Lambuth for Miami around noon.

On Wednesday, November 24, 1993, Rizo had to wait for Gadwell to make up a test before leaving for Florida for Thanksgiving. They left Lambuth between noon and 2:00 p.m. and were delayed in traffic because of construction, and arrived at Boca Raton at sunrise on Thanksgiving Day. After dropping off Gadwell, Rizo drove to his mother's house in the Keys and arrived between 8:00 and 8:30 a.m. Rizo stayed for four or five hours, "[g]ive or take," then decided to drive to Alabama to see Juliana. Evidentiary Hr'g Tr. at 26 (July 27, 2012). When he left the Keys, it started to get dark outside but Rizo did not know exactly what time he left. He drove to Tuscaloosa, where he stopped at a hotel and slept. When he woke up, he called Juliana, who told him he had driven past the exit for her parents' house. After he arrived at Juliana's home, Rizo went to a football game with her father. Thereafter, they went to dinner and stopped back at Juliana's house; Meadow then took Rizo to Turk's house, where he spent the night. Rizo spent the rest of the weekend with Juliana and her family; he drove back to Lambuth with Juliana on Sunday night.

In March 1994, Rizo saw Juliana and his teammates every day leading up to spring break. During spring break, which lasted from the evening of Friday, March 4, through Sunday, March 13, Rizo drove to the Florida Keys with Ouderdorp and Salo. They spent some of their time fishing; Rizo also bought Juliana's engagement ring that week. On March 14, 1994, after returning from spring break, he proposed to Juliana. The ring had the date "3-14-94" engraved inside the band. For the rest of that month, Rizo remained at Lambuth and saw Juliana every day. On March 31, 1994, Rizo and Juliana drove to Birmingham, Alabama, and spent the night at a hotel. The next morning, they drove to Meadow's house. Rizo asked Meadow's permission to marry Juliana; initially, Meadow thought Rizo was joking. Rizo spent the weekend at the Meadows' house; on Sunday, Rizo and Juliana drove back to Lambuth.

After he was arrested, Rizo initially was represented by Sohn; Sohn later was removed from the case, and Armstrong became Rizo's attorney. At their third meeting, Rizo told Armstrong he had five possible witnesses for his case, but Armstrong changed the subject. Armstrong did not question Rizo about his alibi witnesses nor did he discuss doing an investigation or ask Rizo whom he should contact. During trial, when one of the cooperating codefendants testified Rizo was involved in the Carmelo robbery, Rizo told Armstrong he had witnesses who could testify to his whereabouts during that period. Armstrong told Rizo it was too late to bring in alibi witnesses.

On cross-examination, Rizo testified his grandfather was his only alibi witness for the Lozano robbery on June 29, 1992, and acknowledged his grandfather had not been able to provide a specific alibi at sentencing. Rizo told Armstrong he had possible alibi witnesses for the Lozano, Cano, and De la Torre robberies, which occurred on June 29, 1992, April 30, 1993, and November 24, 1993, respectively. Rizo told Armstrong he was in Tennessee at the time of the Cano robbery. He gave Armstrong a list of the names of the people he was with but did not give him any telephone numbers or tell him specifically what he had been doing at the time. He also did not give Armstrong a telephone

number for Juliana. Rizo denied having been told to have his potential alibi witnesses call Armstrong. He agreed he did not have any reason to provide Armstrong with alibi witnesses for the Carmelo robbery prior to trial, because he was not accused of being involved in that robbery until trial. Rizo did not think Armstrong was doing a good job at the time of trial but never complained to his father, his father's attorney, or the judge. Rizo conceded he probably had not given all of the names listed in his affidavit to Armstrong prior to trial.

Armstrong testified he had been a member in good standing of the Florida Bar since 1979, had not been disciplined by any bar of which he was a member, and had not been found to have provided ineffective assistance of counsel in a criminal case. Armstrong began his career in the Office of the Dade County Public Defender, where he handled various felony cases, including drug and robbery cases. Armstrong estimated he had participated in hundreds of trials, fifty or sixty of which were jury trials while he was a public defender. Armstrong went into private practice after leaving the Public Defender's Office and continued to represent criminal defendants. During his time at the Public Defender's Office, Armstrong learned "one of the worst things you can do is put on a nonairtight alibi," because it "shifts the whole dynamics of a trial" and causes the jury to lose "sight of the fact that it's the government's burden of proof and begins to focus on your failure to prove your aspect of the case." Evidentiary Hr'g Tr. at 115 (July 27, 2012). Armstrong had investigated many alibi defenses in his career, but had not presented one in court because he had "never found one that withheld the test." *Id.* at 116. Armstrong noted two of Rizo's codefendants had presented "sloppy alibi[s]" and received guilty verdicts. *Id.*

Armstrong testified he had not seen the letter Juliana wrote Sohn or the attached documents until a couple of days before the evidentiary hearing. He entered his appearance in Rizo's case on August 30, 1996, and trial started March 3, 1997. Armstrong met with Rizo every two or three weeks prior to trial. Based on his review of discovery, Armstrong believed the only evidence tying Rizo to the alleged crimes was the testimony of "government snitches." *Id.* at 124. He asked Rizo how to contact Juliana; Rizo told Armstrong the names of some people whom Rizo said could show he was at school in Tennessee at the relevant time. Armstrong asked if those witnesses were going to be able to say Rizo was in Tennessee on the specific dates alleged; Rizo responded "well, not exactly ... I was on the road." *Id.* at 126 (internal quotation marks omitted). Armstrong asked Rizo if anyone was with him on the road; while Rizo provided some names, he did not have their telephone numbers. Armstrong attempted to contact Juliana several times between September and November 1996 but could not reach her. Consequently, Armstrong told Rizo to have the witnesses call his office.

Armstrong did not recall ever receiving a fax or telephone calls from Ingram. He also did not remember receiving any faxes from Juliana. Armstrong spoke to Juliana for the first time in December 1996 and met with her at his office for the first time in January 1997. Armstrong told her Rizo had mentioned alibi witnesses and asked Juliana to have those witnesses contact him. Armstrong confirmed the first time he heard about the Carmelo robbery was during trial. He also stated Rizo never complained to him during the trial that none of the alibi witnesses had been contacted.

Armstrong testified on cross-examination, when he asked Rizo where he was

during the Cano robbery on April 30, 1993, Rizo had said he was on the road; however, when Armstrong asked Rizo when he arrived in Miami, Rizo stated he arrived a day or two before the 30th. The same was true regarding the De la Torre robbery on November 24, 1993; Rizo initially said he was on the road that day but then told Armstrong he arrived in Miami a "day or so before Thanksgiving." *Id.* at 151.

Armstrong did not speak to any alibi witnesses, because they did not call him. Armstrong had not heard of Poole or Velasquez, Rizo's grandfather, until he began reviewing Rizo's § 2255 motion prior to the evidentiary hearing. Armstrong neither hired an investigator in Rizo's case nor used investigators as a general matter. He conceded Juliana's testimony about her birthday dinner on April 28, 1993, would have been relevant to rebut allegations about Rizo's conduct on the day of the Cano robbery; however, that testimony would not have established an alibi for April 30, 1993, the actual date of the robbery. Having heard Gadwell's testimony about the drive from Lambuth, Armstrong seriously would have considered presenting that testimony to dispute allegations regarding the De la Torre robbery on Wednesday, November 24, 1993. He explained, however, Rizo had told him those events occurred a day or two before Thanksgiving. While Armstrong did not interview Gadwell, he told Rizo and Juliana to have any witnesses contact him, but Gadwell never did.

Armstrong probably would not have called Ouderdorp as a matter of strategy regarding the uncharged Carmelo robbery in late March 1994. He explained trying to establish an alibi for a date not certain is difficult and doing so dilutes the force of the argument the government bears a heavy burden of proof. He probably would not have called Juliana, because Juliana

insisted on attending the trial even though Armstrong was against it in case they needed to call her as a witness. Armstrong would have liked to present Meadow's testimony about April 1, 1994, if he had known about it and could have determined it would have impeached one of the government's witnesses. He conceded it prejudiced Rizo that the jury did not hear Meadow's testimony; however, it was "a far leap" to say the jury would have concluded Rizo was not guilty of the charged offenses, because he was not guilty of the uncharged Carmelo robbery. *Id.* at 180.

On redirect, Armstrong affirmed he had not received the telephone numbers of any of the alibi witnesses. Knowing what he did know about the proposed alibi testimony, he was not sure he would have called those witnesses. While certain aspects of their testimony were "attractive" and had "indicia of truthfulness," he was still unsure whether calling those witnesses was the best strategy. *Id.* at 190-91.

### 2. Resolution of Rizo's § 2255 Motion

After the evidentiary hearing, the parties submitted post-hearing memoranda and the magistrate judge filed his R&R. In the R&R, the magistrate judge noted all of Rizo's witnesses, except Poole, had provided affidavits; however, "post-trial, self-serving affidavits, such as those ... are generally viewed as suspect." R&R at 11 (citation and internal quotation marks omitted). In determining the reasonableness of Armstrong's actions, the magistrate judge further noted, the judge must look at the information available to Armstrong at the time to determine the reasonableness of his actions. Because neither the government's discovery nor the information provided by Sohn contained information concerning the alibi witnesses, and the information provided to Armstrong by

Rizo and Juliana was disputed, the judge explained the ineffectiveness issue was contingent upon his credibility determinations.

The magistrate judge noted the indictment had named Rizo in connection with the Cano and De la Torre robberies and the Puerto Rico rip-off; however, there was no indication Rizo would be implicated in the Carmelo robbery until the middle of trial. After summarizing the hearing testimony, the magistrate judge found:

> [F]or the most part, the evidence was contradictory and failed to support the contention that Armstrong rendered ineffective assistance by neglecting to contact and present alibi witnesses on Rizo's behalf. Moreover, with respect to the substance of their purported alibi testimony, the various witnesses contradicted themselves and each other and fell short of providing an alibi for Rizo's whereabouts on the dates of the alleged crimes.

*Id.* at 21. The judge noted there was a direct contradiction between Rizo's testimony and Armstrong's testimony concerning what information was provided to Armstrong about the alibi witnesses; consequently, he had to make a credibility determination to resolve the factual dispute. Having heard the witnesses' testimonies, observed their demeanor, and taken into account their interests in the outcome of the proceeding, the magistrate judge found Armstrong's testimony was more credible than that of Rizo and his prospective witnesses.

The magistrate judge discredited the testimony of Rizo and Juliana. He noted Juliana testified she had sent Armstrong a fax listing eight possible alibi witnesses but was unable to produce a copy of the fax or prove it was sent. Included among the names Rizo and Juliana allegedly provided to Armstrong were those of witnesses whose relevance could not have been known prior to trial, because they provided alibi testimony concerning the Carmelo robbery, in which Rizo was not implicated until the middle of trial; Rizo admitted as much at the hearing. Juliana testified she had contacted all of the alibi witnesses prior to trial to see if they would be available to testify, but Poole and Gadwell testified they first were contacted about Rizo's sentencing, not his trial, and Gadwell testified he was contacted by Rizo's attorney. The judge also noted Ingram had not provided any proof of her claimed attempts to contact Armstrong by telephone and fax.

The magistrate judge remarked Armstrong was an experienced attorney; he was "hard-pressed to believe that any counsel . . . when presented with a slew of alibi witnesses ready, willing and able to provide slam-dunk testimony, would ignore a rare opportunity to exonerate a young client facing a significant portion of his lifetime in prison." *Id.* at 22. Moreover, it would be unreasonable to conclude a defendant such as Rizo would not have insisted Armstrong contact all of the alibi witnesses or, at the very least, alerted the trial judge of Armstrong's failure to do so. Yet Rizo never complained about Armstrong's performance. The more reasonable conclusion was Rizo failed to provide adequate information about the witnesses to Armstrong at the time of trial, then years later attempted to reconstruct alibis that would match up with the dates of the crimes. The magistrate judge stated the inconsistencies in the witnesses' affidavits and hearing testimonies bolstered this conclusion.

The magistrate judge concluded Rizo's testimony and Juliana's testimony "regarding what names were provided and when they were provided to Armstrong [was] suspect," and "comport[ed] to a version of

the facts that only became available from studying the post-trial transcripts." *Id.* at 23. Therefore, the judge found the information Rizo and Juliana provided to Armstrong about the alibi witnesses was "inconsistent and scant"; although Armstrong had a duty to investigate, he was not required to "exercise superhuman powers of divination" and "pull witnesses out of thin air," when Rizo and Juliana were the only ones who would have had the pertinent information about the alibi witnesses. *Id.* at 24. Because Armstrong was unaware of the existence of some of the alibi witnesses, he could not be deemed deficient for failing to investigate those witnesses. The judge concluded Armstrong's actions were within the realm of reasonable strategic decisions and entitled to deference.

The magistrate judge also found it was unlikely the outcome at trial would have been different had Armstrong presented the alibi testimony. There was no sustainable alibi defense for the Lozano robbery in June 1992 and Puerto Rico rip-off in late July 1992, because the only possible witness was Rizo's grandfather, who could not account for Rizo's whereabouts on the relevant dates. No claim of ineffectiveness could stand regarding the Carmelo robbery, because that robbery was not discovered until the middle of trial. The magistrate judge found the testimony about the Cano and De la Torre robberies "fell short of providing an alibi and lacked credibility"; even if Armstrong's performance was deficient, Rizo failed to demonstrate prejudice. *Id.* at 26. Consequently, the magistrate judge recommended Rizo's § 2255 motion be denied.

Rizo objected to the R&R and requested a de novo hearing before a district judge. He argued the magistrate judge's credibility findings rested on three false premises: (1) the witnesses did not come forward until years after the trial, which make

their testimony suspect; (2) the witnesses' testimony was relevant only to the dates of the charged crimes themselves, and not for the dates the cooperating witnesses testified Rizo was in Miami assisting in planning and preparation for the charged crimes; and (3) the government's case was sound. Rizo asserted the magistrate judge erroneously shifted the burden to Rizo to investigate his own case and Armstrong's aversion to presenting an alibi defense in favor of focusing on the government's burden was not a reasonable strategic decision.

The district judge adopted the R&R and denied Rizo's § 2255 motion. She noted the magistrate judge made three "key findings": (1) Rizo "failed to give [Armstrong] adequate information concerning the potential alibi witnesses"; (2) "even if [Armstrong] had known what testimony the alibi witnesses would have given, [he] would not have called them as a matter of strategy"; and (3) "the alibi witnesses would not have affected the outcome of the proceedings because they did not provide plausible alibis." Order Adopting R&R at 2. The judge concluded Rizo had not established deficient performance, the first prong of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); therefore, he was not entitled to relief, even if he had suffered prejudice as a result of Armstrong's actions. The judge also noted Rizo had not objected to the magistrate judge's summary of the case and of the evidence presented at the evidentiary hearing; he had objected to the weight the magistrate judge accorded to the various witnesses' testimony. None of Rizo's objections directly challenged the magistrate judge's conclusion Armstrong's performance was not deficient. His objections related to the prejudice prong of *Strickland*; even if she were to sustain those objections, it would not affect the conclusion that Armstrong's performance

was not deficient, because Rizo did not provide sufficient information about the alibi witnesses.

The district judge concluded Armstrong's decision not to investigate the alibi witnesses was not deficient. Rizo and Armstrong's testimony at the evidentiary hearing confirmed Rizo did not aid Armstrong in finding and contacting his alibi witnesses, did not provide Armstrong details regarding his alibis, and had indicated to Armstrong the witnesses would not be able to provide him an airtight alibi. Juliana's testimony regarding when she first contacted Armstrong had changed over time, which undermined the reliability of her recollection. Because Armstrong received limited information concerning the potential alibi witnesses, and Rizo told Armstrong he had arrived in Miami a day or two before the charged offenses, it was not unreasonable for Armstrong to decide not to undertake an independent investigation of the alibi witnesses. Furthermore, Armstrong was not deficient for failing to call the alibi witnesses, because Armstrong's strategic choice not to put on an imperfect alibi defense was not an unreasonable choice that no competent counsel would have made. Because Rizo failed to satisfy the first prong of *Strickland*, the district judge concluded she need not address the prejudice prong.

In granting Rizo a COA, we asked him to address (1) "Whether, in denying relief on Rizo's ineffective-assistance claim, the district court's factual findings were supported by any evidence at all or were clearly erroneous;" and (2) "Whether Rizo's trial counsel was ineffective for failing to investigate and present alibi witnesses at trial." Order at 3, *Rizo v. United States*, No. 15-10679 (11th Cir. Oct. 19, 2015) (granting certificate of appealability).

## II. DISCUSSION

### A. Factual Findings

On appeal, Rizo argues the district judge's factual findings were unsupported or clearly erroneous, because they ignored the limited availability Rizo had to access witnesses while he was in pretrial detention and improperly placed the burden on him. He asserts the district judge's reliance on Armstrong's testimony was clearly erroneous, because the testimony conflicted with other testimony and physical evidence. Armstrong's testimony Rizo had stated he was "on the road" at the time of the charged offenses was consistent with the alibi witnesses' testimony. Evidentiary Hr'g Tr. at 126 (July 27, 2012).

"In a section 2255 proceeding, we review legal conclusions *de novo* and factual findings for clear error." *Osley v. United States*, 751 F.3d 1214, 1222 (11th Cir. 2014). A factual finding is clearly erroneous if, in light of all of the evidence, we are left "with the definite and firm conviction that a mistake has been committed." *United States v. McPhee*, 336 F.3d 1269, 1275 (11th Cir. 2003) (citation and internal quotation marks omitted). "Ineffective assistance of counsel claims are mixed questions of law and fact that we review *de novo*." *Osley*, 751 F.3d at 1222.

We give substantial deference to a factfinder's credibility determinations regarding witness testimony in a § 2255 proceeding; we will not disturb a credibility finding unless it is "so inconsistent or improbable on its face that no reasonable factfinder could accept it." *Rivers v. United States*, 777 F.3d 1306, 1316–17 (11th Cir.) (citation and internal quotation marks omitted), *cert. denied*, —— U.S. ——, 136 S.Ct. 267, 193 L.Ed.2d 212 (2015). We will uphold a district judge's credibility determination "unless the court's understanding of the facts appears to be unbelievable." *Id.* at 1317 (citation and internal quotation marks

omitted). Where it is clear the factfinder weighed the testimony of all of the witnesses, taking into account relevant factors such as their interests in the case, the consistency or inconsistency of their testimony, and their demeanor on the stand, we will accord deference to the factfinder's credibility determinations. *See United States v. Ramirez–Chilel*, 289 F.3d 744, 750 (11th Cir. 2002).

The magistrate judge's findings, adopted by the district judge, regarding what information was available to Armstrong about the alibi witnesses and the reasonableness of his decision not to investigate, were dependent on the magistrate judge's credibility determinations. The magistrate judge determined Armstrong's testimony was more credible than that of Rizo and Juliana, because it provided a more reasonable account of what information Armstrong received. That determination was not so inconsistent or improbable as to be unacceptable to any reasonable factfinder. *See Rivers*, 777 F.3d at 1316–17.

The magistrate judge clearly weighed the testimony of all witnesses and considered their demeanor, their interests in the outcome of the case, and the consistencies and inconsistencies in their testimony. *Ramirez–Chilel*, 289 F.3d at 750. Critical to the judge's determination were the significant inconsistencies in testimony of Rizo and Juliana about what information they had provided to Armstrong and their own efforts to contact the witnesses. Rizo and Juliana testified they had provided lists of eight or nine alibi witnesses to Armstrong prior to trial but those purported lists contained the names of witnesses whose testimony would have served to provide an alibi for the Carmelo robbery, which was disclosed in the middle of trial. Rizo conceded at the evidentiary hearing he could not have known those witnesses' testimony would be relevant prior to trial. Juliana

testified she had contacted all of the witnesses prior to trial regarding their availability to testify on Rizo's behalf; however, Poole and Gadwell testified they were not contacted until sentencing.

Juliana and Ingram both provided inconsistent testimony regarding their alleged contacts with Armstrong. Juliana stated in her § 2255 affidavit she first spoke with Armstrong in December 1996, consistent with Armstrong's recollection; at the hearing, she testified she first contacted Armstrong in September 1996. Ingram stated in her § 2255 affidavit she had attempted to contact Armstrong only once by fax; at the hearing, she testified she had attempted to call Armstrong's office multiple times. Ingram initially did not recall her prior statement about the fax until she refreshed her memory by reviewing her § 2255 affidavit and could not explain why she had not included the information about the telephone calls in her affidavit.

Based on these inconsistencies, it was reasonable for the magistrate judge to conclude Armstrong's testimony presented a more plausible account. *See Rivers*, 777 F.3d at 1317–18; *Ramirez–Chilel*, 289 F.3d at 750. Because the magistrate judge's understanding of the facts does not appear unbelievable, his credibility determination is entitled to deference. *See Rivers*, 777 F.3d at 1316–17; *Ramirez–Chilel*, 289 F.3d at 750. Giving deference to the magistrate judge's determination, neither he nor the district judge clearly erred in finding Rizo did not provide sufficient information to Armstrong regarding his alibi defense. *See McPhee*, 336 F.3d at 1275.

### B. Claim of Ineffective Assistance

■ Rizo also argues Armstrong's performance was deficient, because he had failed to investigate the alibi witnesses. He asserts Armstrong's deficient performance prejudiced his defense, since there is a

reasonable probability the jury would have reached different conclusions regarding his alleged participation in the De la Torre and Cano robberies. He contends the jury likely would have considered the untruthfulness of the cooperating codefendants regarding those crimes, when weighing their testimony about Rizo's participation in the other charged offenses.

To succeed on an ineffective-assistance-of-counsel claim, a defendant must satisfy the two-part test outlined in *Strickland*. *Osley*, 751 F.3d at 1222. Under that standard, the defendant must show (1) counsel's performance was deficient, and (2) he was prejudiced by the deficient performance. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. Counsel's performance is deficient only if, under the totality of the circumstances at the time of counsel's conduct, it falls below the wide range of competence demanded of attorneys in criminal cases. *See id.* at 687–91, 104 S.Ct. at 2064–66. In determining whether counsel's performance was deficient, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690, 104 S.Ct. at 2066. That presumption is even stronger when examining the performance of an experienced criminal defense attorney. *Chandler v. United States*, 218 F.3d 1305, 1316 (11th Cir. 2000) (en banc). "[T]he fact that a particular defense ultimately proved to be unsuccessful [does not] demonstrate ineffectiveness." *Id.* at 1314.

A defendant is prejudiced by counsel's deficient performance if counsel's errors were "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. The defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. A defendant

must satisfy both *Strickland* prongs to state a successful ineffective assistance claim, and courts need not address both prongs if the defendant fails to make the necessary showing on one. *See id.* at 697, 104 S.Ct. at 2069; *Osley*, 751 F.3d at 1222.

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066. Counsel is under no absolute obligation, however, to investigate particular facts or any specific line of defense. *Chandler*, 218 F.3d at 1317. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91, 104 S.Ct. at 2066. "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691, 104 S.Ct. at 2066.

"The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Id.* Thus, what investigative decisions are reasonable depends largely on the information the defendant supplied. *Id.* For example, if the defendant has given counsel reason to believe certain lines of investigation would be fruitless or even harmful, the defendant may not later argue counsel's failure to pursue those investigations was unreasonable. *Id.* Even if a decision not to investigate appears unwise in hindsight, we will not hold it to have been ineffective assistance unless the decision was "so patently unreasonable that no competent attorney would have chosen it." *Dingle v. Sec'y for Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007) (citation and

internal quotation marks omitted). The decision to pursue one particular line of defense to the exclusion of others, even if counsel did not investigate the other possible defenses, is a strategic decision "and is not ineffective unless the petitioner can prove the chosen course, in itself, was unreasonable." *Chandler*, 218 F.3d at 1318 (footnote omitted). Likewise, decisions regarding the presentation of witnesses are matters of trial strategy, and we seldom second guess those decisions. *See Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc).

Rizo contends Armstrong was ineffective, because he failed to investigate and present an alibi defense. Armstrong's duty to investigate, however, was dependent on the information he received regarding the potential alibi witnesses. *See Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066. The judge did not err in crediting Armstrong's testimony. *See Rivers*, 777 F.3d at 1317–18. Armstrong determined the information Rizo and Juliana had provided was limited and inconsistent. Armstrong testified Rizo and Juliana had mentioned potential alibi witnesses but did not provide him with contact information; nor did any potential witnesses contact Armstrong, even after he repeatedly told Rizo and Juliana to have any alibi witnesses call his office. Rizo had said the alibi witnesses would "not exactly" be able to place him outside of Miami on the dates of the Cano and De la Torre robberies, because he was "on the road." Evidentiary Hr'g Tr. at 126 (July 27, 2012) (internal quotation marks omitted). When pressed by Armstrong, Rizo stated he had arrived in Miami one or two days before each of those robberies.

Because of the limited information Armstrong had received, it was not unreasonable for him to conclude pursuit of a poten-tial alibi defense would likely be fruitless and instead to pursue a strategy focused on impeaching the testimony of the government witnesses. *See Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066; *Chandler*, 218 F.3d at 1318. That Armstrong's defense strategy ultimately did not succeed does not make his choice unreasonable. *Chandler*, 218 F.3d at 1318. In his experience, Armstrong found imperfect or incomplete alibi defenses to be more harmful than helpful, because they shift the jury's focus from the government's burden to the holes in the defendant's alibi; therefore, he would not present an alibi defense unless it was airtight. That strategic choice is entitled to an especially strong presumption of reasonableness in this case; Armstrong was an experienced criminal defense attorney, having practiced for a number of years as a public defender and trying between fifty and sixty criminal cases, before entering private practice and continuing to represent criminal defendants. *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052; *Chandler*, 218 F.3d at 1316; *see also Waters*, 46 F.3d at 1512.

Rizo failed to overcome the presumption of adequate assistance and to demonstrate Armstrong's performance was deficient. Given the information he received from Rizo and Juliana, Armstrong was not ineffective in choosing not to investigate or present alibi witnesses and instead focusing on the government's failure to meet its burden.[1] The district judge did not err in concluding Armstrong's performance was not deficient or in denying Rizo's § 2255 motion.

**AFFIRMED.**

---

1. Because Rizo has not satisfied the first prong of *Strickland*, we need not address the prejudice prong. *See Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069; *Osley*, 751 F.3d at 1222.