[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-17741
Non-Argument Calendar

_____

D.C. Docket No. 1:12-cv-03448-RLH; 1:05-cr-00479-RLH-1

HARRISON NORRIS, JR.,

Petitioner-Appellant,

versus

UNITED STATES OF AMERICA,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(September 22, 2017)

Before MARCUS, WILLIAM PRYOR and FAY, Circuit Judges.

PER CURIAM:

Harrison Norris, a federal prisoner, appeals, for the second time, the denial

of his motion to vacate his sentence. 28 U.S.C. § 2255. In his motion, Norris

alleged that he was denied a fair trial by former District Judge Jack Camp who, Norris contends, was mentally incompetent and racially biased against him, in violation of the Due Process Clause of the Fifth Amendment. In Norris's first appeal, we affirmed the denial of his allegation that Camp was incompetent, but "[b]ecause Norris sufficiently alleged that Judge Camp was actually biased against him, we reverse[d] and remand[ed] for an evidentiary hearing" on that issue. *Norris v. United States*, 820 F.3d 1261, 1263 (11th Cir. 2016). On remand, the district court found "no credible evidence" that "Judge Camp was . . . biased against African-Americans in general or against Mr. Norris in particular," and it issued a certificate of appealability for the review of its factual finding. We affirm.

## I. BACKGROUND

Norris based his postconviction motion on a recorded telephone conversation in which Camp's mistress, S.R., suggested that race might influence the sentence he selected for Norris. Camp debated whether a sentence of life without parole "was too strong" and sought S.R.'s input because she had "been there and done that" by being coerced and intimidated by her boyfriend. S.R. "remember[ed] [Camp] telling [her] . . . that [he] couldn't help but want to give . . . guys like that [a sentence of] life," and Camp replied, "maybe I should, see. I'm much more sensitive to that after talking with you." S.R. remarked, "I was just trying to talk you down out of the whole . . . racism thing because at one point in

2

time . . . you were like, I just can't help it, I want to give them all life." Camp responded, "Yeah," that he "did think [S.R.] was done like that" and had been concerned when she excused her boyfriend's decision to "drop[] [her] off at [a] black club and left," which in Camp's opinion, "was [intended] to intimidate . . . and, get [her] use[d] to that sort of thing . . . ." S.R. responded that she "was just being naïve . . . and that sounds like [Norris] . . . with those girls . . . ."

S.R. asked Camp for his "personal opinion when he s[aw] a black guy like that" mistreat women who S.R. assumed "were white." Camp stated that "almost all of [the victims] were white girls." S.R. asked what Camp thought "about that situation in general, like the black guys doing that s***," and suggested that it must "be hard to . . . be fair when you know that this motherf***** really deserves a lot of time." Camp answered, you "think that it's unforgiveable," yet "the problem . . . is [most people question] why have [women] stuck with it why didn't they just leave." After S.R. remarked, "[s]ometimes you can't," Camp stated, "You've made me much more sensitive to that," and then he reassured her that "being naïve, that's one of your nicest qualities" and urged her "to stop and think more . . . ."

S.R. questioned whether Camp no longer "fe[lt] that way . . . when you see a black person," and he reassured her, "No, I do, I do." S.R. "guess[ed] the way you had talked about it before . . . it burn[ed] you up . . . and you just couldn't help but

3

want to give them, you know," and Camp countered, "[i]t does burn me up but . . . locking him up until he's maybe sixty-eight [is] enough." Camp concluded the conversation by saying, "these . . . cases aren't ever black and white because there's always two sides."

At the evidentiary hearing, S.R. testified that she told Camp that her black boyfriend, R.B., had beaten her. Camp was jealous of R.B. yet pitied him because of his struggles with drug addiction and his experiences in prison. S.R. stated that Camp never used racially derogatory terms around her and that, during their telephone conversation, he agreed with her comments about black men in relation to her unhealthy relationship with R.B. S.R. stated that Camp's remarks about what sentence to impose derived not from being "a racist person, but [to] the fact that [Norris's case] just reminded [Camp] of [the] personal situation that he was going through" with her. S.R. stated that Camp never said he would judge a black man more harshly.

Norris called two women, Katrina Hardy and Diane Kirk, to testify about telephone calls in which Camp allegedly made racial slurs. Hardy testified that a man called her twice about S.R.'s failure to pay rent and, during the first call, he referred to Hardy as a "n*****" and said S.R. was not going to pay "a f***ing thing." When the man called back, he identified himself as a judge, threatened to sue Hardy if she tried to collect rent from S.R., and said he would "lock [Hardy's]

4

n***** ass up." Kirk testified that she overheard the first telephone call in which the caller got angry and made racial slurs, but Kirk said she was undergoing treatment for memory loss and could not recall what racist terms the caller used.

Todd Goodson, an agent of the Federal Bureau of Investigation, testified that Kirk and Hardy gave inconsistent accounts of Camp's first telephone call. On two occasions, Kirk told Goodson that the caller identified himself as S.R.'s family attorney and that the caller never identified himself as a judge, never cursed, and never made racial slurs. Hardy told Goodson that the caller identified himself as a judge and referred to R.B. as a black "n*****," but the caller did not use any other racial epithets.

Norris testified that Camp had discriminated against him. Norris complained that Camp denied his *pro se* motions for discovery, to sever his trial from that of his codefendants, and to visit and photograph his property that he used ostensibly to train female wrestlers. Norris accused Camp of "call[ing] quite a few of" Norris's codefendants to "offer[] them plea deals" and of being "prejudiced" not "because [Norris] was a black man, but because [he] was a smart black man, an intelligent black man." Norris asserted that "Judge Camp was biased" because he imposed lesser sentences on "[w]hite women in this case, the co-conspirators." Norris also asserted that "Judge Camp [had been] jealous of [Norris's] lifestyle" of "living . . . with six women in two houses side by side" and that Camp had

5

infringed on his family's "freedom of speech" by making them remove "t-shirt[s] [they wore to Norris's trial] . . . that said peonage is not a crime in the state of Georgia."

Camp testified about his relationship with S.R. and explained that their telephone conversation pertained to men abusing women. Camp also explained that his statements about things burning him up and being unforgiveable referred to men exploiting women and to Norris's intimidation, beating, and forced prostitution of his victims, which Camp regarded as reprehensible by "any man" regardless of his race. Camp stated that he never disparaged or was prejudiced against black men, nor did he use racial epithets around S.R. He agreed with and ignored some of S.R.'s racially-charged statements to appease her, even though she broached the topic "out of the blue." He told S.R. that she had made him more sensitive because she had felt trapped in her relationship with R.B. Camp admitted that he called Hardy to explain that S.R. was financially insolvent.

Camp said Norris did a "good job" as a *pro se* litigant. Camp recalled being hesitant about sentencing Norris to life imprisonment because his codefendants received lesser sentences, yet the government had provided persuasive reasons to give Norris a long sentence. Camp disavowed that race affected his rulings at trial or that he was racially biased.

6

Camp's former colleagues testified that he was unbiased. Jan Kay, a federal probation officer who worked with Camp for 20 years, testified that she never witnessed him take race into account in sentencing or utter a racial slur. Robert Fowler and Stewart Alford, Camp's former law clerks, and Kay testified that Camp never voiced any racial animosity against Norris. Alford testified that he "felt strongly that [a] life sentence was appropriate for Mr. Norris" and "had several conversations" with Camp, who "spent a lot of time thinking about" and "struggled with" imposing such a long sentence.

Camp's friends also testified that he was not biased. Charles Atkinson, an African-American, testified that he never heard any racial remarks from Camp, who was Atkinson's long-time neighbor, provided pro bono services to Atkinson's church, and participated with Atkinson in a mixed-race group of runners. Dana Graham, who was an African-American minister, testified about Camp helping him find a job after retiring from the Marines and about counseling Camp after his arrest.

The district court found that Camp had not been racially biased and had "viewed Mr. Norris entirely based on the merits . . . [and] the evidence of what Mr. Norris did." The district court found that Camp's conversation with S.R. contained "nothing about race"; focused on his disapproval of domestic abuse; and revealed that he was contemplating giving Norris a lesser sentence than recommended by

the government. The district court credited S.R.'s testimony that Camp had never disparaged anyone because of their race and credited the testimonies of Camp, his colleagues, and his friends. The district court discredited Hardy's testimony "based on her demeanor," the improbability that a lawyer attempting to settle a rental dispute would open negotiations by cursing the landlord, and the inconsistencies between Hardy's testimony, her statements to Agent Goodson, and Kirk's testimony. The district court also discredited Kirk's testimony because it was inconsistent with her statement to Agent Goodson, she had an "impaired memory," and she could not recall racial epithets that, if made, would have left a lasting impression.

## II. STANDARD OF REVIEW

"In a Section 2255 proceeding, we review . . . factual findings under a clear error standard." *Jeffries v. United States*, 748 F.3d 1310, 1313 (11th Cir. 2014) (quoting *Lynn v. United States*, 365 F.3d 1225, 1232 (11th Cir. 2004)). That standard requires us to affirm "findings of fact unless the record lacks substantial evidence to support them." *San Martin v. McNeil*, 633 F.3d 1257, 1265 (11th Cir. 2011).

## III. DISCUSSION

Under "the Due Process Clause[, Norris was entitled to] a fair trial in a fair tribunal, before a judge with no actual bias against [him] or interest in the outcome

8

of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904–05 (1997). For Norris to obtain postconviction relief, he had to prove that, "under a realistic appraisal of psychological tendencies and human weakness, the judge[] pose[d] . . . a risk of actual bias or prejudgment [such that it created an intolerable threat to] the guarantee of due process." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 883–84 (2009). The district court had to determine "whether sitting on the case . . . would offer a possible temptation to the average judge to lead him not to hold the balance nice, clear and true." *Id.* at 879 (internal quotation marks and citation omitted).

We give substantial deference to the credibility determinations of the district court because it personally observed the witnesses and was in a better position than a reviewing court to assess their credibility. *Rivers v. United States*, 777 F.3d 1306, 1316 (11th Cir. 2015); *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002). Its "choice of whom to believe is conclusive on [this Court] unless the judge credit[ed] exceedingly improbable testimony." *Ramirez-Chilel*, 289 F.3d at 749 (quoting *United States v. Cardona-Rivera*, 904 F.2d 1149, 1152 (7th Cir. 1990)). "Consequently, we generally will not disturb a credibility finding unless it is so inconsistent or improbable on its face that no reasonable factfinder could accept it." *Jeffries*, 748 F.3d at 1313 (internal quotation marks and citation omitted).

9

The district court did not clearly err by crediting S.R.'s and Camp's testimony. S.R.'s testimony that Camp did not use racial epithets and was not prejudiced against black men was consistent with the contents of their telephone conversation in which Camp never uttered a racial slur, never mentioned race, and grappled with an appropriate sentence for Norris based on the facts of his case. Although Camp did not deny or challenge S.R.'s comments about race, she and Camp testified that they were discussing men who abused women and that he was placating S.R. to preserve their relationship. And S.R.'s and Camp's testimony that he was not racially biased was consistent with the favorable portrayal of him given by his friends and former colleagues. Norris does not dispute that Camp's friends and colleagues gave credible accounts that he regarded black and white persons equally in society and in his courtroom.

The district court also did not clearly err by discrediting Hardy's and Kirk's testimonies. Hardy's testimony that Camp called her a "n*****" was inconsistent with her statement to Agent Goodson that Camp used that slur only in reference to S.R.'s boyfriend. Hardy also did not tell Goodson that Camp cursed at her. And Hardy's testimony that Camp cursed, identified himself as a judge, and made racial slurs during his first telephone call conflicted with the events that Kirk described to Goodson. Similarly, Kirk's testimony that Camp used racial epithets was inconsistent with her statement to Goodson. Her testimony also was dubious given

10

her inability to recall Camp's specific slurs. Furthermore, the district court was entitled to discredit Kirk's testimony based on her cognitive deficits. Norris does not contest the finding that Hardy's and Kay's testimonies were unbelievable.

The district court did not clearly err in finding that Camp was not biased against Norris. Norris failed to prove, as he was required to do, *see Rivers*, 777 F.3d at 1316, there existed "a serious risk of actual bias [on the part of Camp] . . . based on objective and reasonable perceptions" of his conduct and communications, *see Caperton*, 556 U.S. at 884. The record supports the finding of the district court that "an average judge [in Camp's shoes would not be] . . . tempt[ed] . . . not to hold the balance nice, clear and true." *Id.* at 879.

## IV. CONCLUSION

We **AFFIRM** the denial of Norris's motion to vacate his sentence.